MARY POLITANO, Plaintiff, *v.* UMBERTO POLITANO, Defendant.

Supreme Court, Kings County, March 1, 1933.

*Bernard R. Schulman*, for the motion.

*Joseph F. Conran*, opposed.

BONYNGE, J. The defendant, an ignorant and penniless Italian, has been continuously imprisoned for two years and seven months for non-payment of alimony to a young and childless wife, capable of and actually earning her own living. He enjoys the unique, if unhappy, distinction of being the senior inmate of the sheriff's alimony colony.

The parties hereto were married in October, 1927. As their union was blessed with no children, the plaintiff atoned for this by installing her mother and sister as permanent members of the household. The defendant expended his cash savings of $3,000 in fitting up and supporting the home. At the end of eleven months the money was gone and the parties separated. The plaintiff sued for separation and was awarded temporary alimony of ten dollars a week, which was regularly paid. In September, 1929, a decree was rendered in plaintiff's favor fixing the permanent alimony at twelve dollars a week. The defendant is a bricklayer by trade and, in common with most of the artisans in the building industry, has suffered severely as a result of the economic depression. His payments fell in arrears commencing in the fall of 1929, with a consequent adjudication of contempt and warrant of commitment. Successive adjudications of like kind followed, including an order requiring defendant to file a bond of $1,000 to secure payments to

the plaintiff. There is nothing in the record to show that the defendant has fraudulently concealed or divested himself of property or has ever been able to comply with the court's orders. In his plea for release the defendant says: " I am very proud to state that I am an American citizen, and I have also fought for democracy in the front trenches of the World's Great War, and in which war I have not endured the misery, heartache, nervousness and worry as I am during this dreadful incarceration. Your Honor can realize what a Godsend it would mean, were you to give me my freedom and liberty."

This case presents the bald question of whether, and under what circumstances, life or even moderately prolonged imprisonment is permissible for the non-payment of alimony, where the default is not due to sheer willfulness or obstinacy. The denials by other justices of previous applications for discharge by this defendant, as well as the present recommendation of the learned official referee, suggest the necessity for careful consideration of the matter.

Section 5 of article 1 of the Constitution of this State declares that " excessive bail shall not be required nor excessive fines imposed, nor shall cruel and unusual punishment be inflicted, * * *." The Eighth Amendment of the Constitution of the United States proclaims these concepts of liberty and humanity in almost identical language. While it is well settled that this amendment has no application to the laws of the several States (*O' Neil* v. *Vermont*, 144 U. S. 323; *Pervear* v. *Commonwealth*, 5 Wall. 475), nevertheless decisions interpreting it must be accorded great weight in determining the purpose and meaning of like phraseology, wherever found. In *Weems* v. *United States* (217 U. S. 349) the prevailing and dissenting opinions discussed, at great length and with much learning, the question as to whether the phrase " cruel and unusual punishment " was merely a pious condemnation of drawing, quartering, maiming and other barbarities associated with the legal process in an earlier day, or whether it was a forward-looking and progressive declaration of principle. By a vote of seven to two the court upheld the latter view and said (at p. 373): " Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils, but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle to be vital must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions. They are not ephemeral enactments, designed to meet passing occasions. They are, to use the words of Chief Justice

MARSHALL, ' designed to approach immortality as nearly as human institutions can approach it.' The future is their care and provision for events of good and bad tendencies of which no prophecy can be made. In the application of a constitution, therefore, our contemplation cannot be only of what has been but of what may be."

Granting that even a lowly alimony prisoner has constitutional rights, it still remains to be determined whether such rights of this defendant have been violated, bearing in mind that he is a victim of misfortune and not of obduracy. In *Weems* v. *United States* (*supra*) the court, in considering whether a sentence of fifteen years at " painful labor " and other penalties for infringement of a statute of the Philippine Islands, was violative of the constitutional inhibition against " cruel and unusual punishment," viewed the sentence in the light of comparable statutes of the United States and thus reached the conclusion that the constitutional rights of the prisoner had been invaded. It will be instructive to apply a similar test to the plight of this defendant.

Sections 750 and 751 of the Judiciary Law deal with criminal contempts, which exceed in gravity the civil contempt of which the defendant stands adjudged guilty. Under these sections if an intruder disturbs the serenity of a court room by disorderly or insolent behavior, or interrupts the proceedings of the court or willfully resists its lawful mandate, the limits of judicial displeasure are circumscribed by statute to a jail sentence of thirty days and a fine of $250. However, let a waspish woman pluck the sleeve of the judicial gown, or nudge the elbow concealed therein and this temperate restraint is immediately cast aside, and the delinquent spouse faces the possibility of unending imprisonment through successive adjudications of contempt. (Civ. Prac. Act, § 1172.) This carries the supposed rights of women to absurd, not to say unconstitutional, lengths. Through the ages man has yielded authority in the home to the opposite sex and accepted the consequences with humility. With a blend of humor, resignation and affection the relationship has come to be known as petticoat government. While the institution has functioned reasonably well, there are those who doubt the expediency of its extension into a form of petticoat justice.

The correct disposition of this case requires only a candid answer to a single question. Punishment for contempt is a deserved and salutary rebuke to one who has affronted the dignity of a court. If an evildoer invades my court room and reviles me or my ancestors or my country with indecent or blasphemous utterances, a penalty of thirty days is the straight-jacket of my righteous wrath. Can I truthfully say that this defendant who shouldered arms when the

need was great, and now, through poverty or misfortune, omits to pay alimony to a vindictive and relentless wife, has offered my court an affront more than thirty fold greater? The answer being obvious, the report of the learned official referee is set aside and the defendant ordered discharged from imprisonment forthwith.