576 F.2d 405
 Martha CARMONA and Roberta Fowler, Petitioners-Appellees,
v.
Benjamin WARD, Commissioner of the New York State Department
of Correctional Services, Frances Clement, Superintendent,
Bedford Hills Correctional Facility, Bedford Hills, New
York, Frank Caldwell, Acting Chairman of the New York State
Board of Parole and the New York State Board of Parole,
Respondents-Appellants,
and
Sol Greenberg, Albany County District Attorney, Intervenor
for Appellants.
 No. 471, Docket 77-2110.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 13, 1977.
Decided April 21, 1978.
 
 Arthur L. Liman, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Mark C. Morril, Legal Action Center of the City of New York, Inc., Deborah M. Greenberg, Margaret K. Brooks, Harlon L. Dalton, Lawrence S. Goldman, Washington Square Legal Services, Charles D. Terry, E. Judson Jennings, New York City, Elizabeth Bartholet, Cambridge, Mass., Michael Meltsner, New York City, of counsel), for petitioners-appellees.
 Gerald J. Ryan, Asst. Atty. Gen., Buffalo, N. Y. (Louis J. Lefkowitz, Atty. Gen., State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., New York City, of counsel), for respondents-appellants.
 Sol Greenberg, Dist. Atty. of Albany County, Albany, N. Y. (Dennis M. Acton, Albany, N. Y., of counsel), for intervenor for appellants.
 Before MULLIGAN, OAKES and VAN GRAAFEILAND, Circuit Judges.
 MULLIGAN, Circuit Judge:
 
 
 1
 Benjamin Ward, Commissioner of the New York State Department of Correctional Services, Frances Clement, Superintendent, Bedford Hills Correctional Facility, Frank Caldwell, Acting Chairman of the New York State Board of Parole, and the New York State Board of Parole (Respondents-Appellants), appeal from an order entered on August 17, 1977 by the Hon. Constance B. Motley in the United States District Court for the Southern District of New York. The order resulted from a habeas corpus proceeding challenging the constitutionality of the confinement of petitioners Martha Carmona, Roberta Fowler and Donna Foggie.[1] The court found that the indeterminate sentences being served by Carmona and Fowler were unconstitutional because of the maximum mandatory life terms which were imposed. It ordered that the petitioners be discharged from custody at the expiration of their minimum terms of imprisonment unless new maximum sentences were imposed which, in the judgment of the district court, were "constitutionally appropriate." The decision and order of Judge Motley are reported at 436 F.Supp. 1153. We reverse that portion of the order which has been appealed and remand for the entry of an order in accordance with this decision.
 
 
 2
 * A) Carmona
 
 
 3
 Appellee Carmona has been convicted in both the state and federal courts on narcotics related charges. In May 1974 she was indicted on federal charges of conspiracy and two substantive counts of possession of cocaine with intent to distribute it. Eventually, these charges were satisfied by Carmona's pleading guilty to one substantive count. Undaunted by her federal indictment, she continued pursuing her trade. An authorized search of her apartment by the New York City Police Department on July 30, 1974 resulted in the finding of 33/8 ounces of cocaine, some marijuana and paraphernalia associated with drug dealing. She was indicted by a state grand jury in Bronx County on August 13, 1974. The most serious count in the indictment was for possession of a controlled substance in the first degree, an A-I felony with a mandatory minimum sentence of at least 15 years. When she was arrested on July 30, Carmona confessed to possession of the cocaine for the purpose of selling it to a buyer with whom she had already contracted for the sale. The appellee was also subsequently indicted by a state grand jury for sales of heroin to undercover agents on May 30, 1974 and June 24, 1974.
 
 
 4
 Carmona indicated her willingness to cooperate with the police so that she would be eligible for lifetime parole under N.Y. Penal Law §§ 65.00(1)(b), (3) (a)(ii).[2] However, she adamantly refused to reveal her supplier of narcotics. The information she did offer was already known to the law enforcement agents. Therefore, having failed to provide material assistance she was not eligible under the statute for lifetime parole.
 
 
 5
 In satisfaction of all outstanding charges, Carmona was allowed to plead guilty to possession of a controlled substance (cocaine) in the second degree, an A-II felony. On January 31, 1975 her plea was accepted by Justice Cohen of the Supreme Court, Bronx County and, on March 10, 1975, she was sentenced to a term of imprisonment of six years to life. This was the least severe sentence allowed under the law. N.Y. Penal Law §§ 70.00-1, 70.00-2(a), 70.00-3(a)(ii).
 
 
 6
 Investigation had revealed that Carmona was living in a lavishly furnished apartment and enjoying a comparatively high standard of living without any known legal means of support. The reasonable inference is that appellee supported herself by drug trafficking as evidenced by her frequent narcotic-related encounters with the legal system in 1974.
 
 B) Fowler
 
 7
 Appellee Fowler also had extensive first-hand experience with the criminal justice system. Her prior record was succinctly set out by Judge Motley:
 
 
 8
 On April 27, 1972, Ms. Fowler was arrested and charged with criminal possession of a hypodermic instrument (Penal Law § 220.45) and criminal use of drug paraphernalia in the second degree (Penal Law § 220.50). She was adjudged guilty of both charges and sentenced to three years probation. On June 29, 1972, she was arrested and charged with prostitution (Penal Law § 230.00). She was found guilty on August 9, 1972, and was sentenced to one year's probation. On February 22, 1973, she was again arrested, charged with prostitution and found guilty on July 30, 1973. On July 10, 1973, she was arrested and charged with obstructing government administration (Penal Law § 195.05), possession of a dangerous drug (Penal Law § 220.05) (now repealed) and possession of stolen property (Penal Law § 165.45). These charges were dismissed because she pleaded guilty to another charge on July 30, 1973. On July 12, 1973, she was arrested and charged with petit larceny (Penal Law § 155.25), criminal possession of stolen property in the third degree (Penal Law § 165.40), and possession of a forged instrument in the second degree (Penal Law § 170.25). On July 30, 1973, she was convicted of petit larceny and conditionally discharged on three years probation.
 
 
 9
 436 F.Supp. at 1159 n.13.
 
 
 10
 On September 25, 1973 Fowler sold $20 worth of cocaine to a police undercover agent. After a jury trial, appellee was sentenced to a term of four years to life for an A-III felony. Her sentence was upheld unanimously by both the Appellate Division, 46 A.D.2d 838, 361 N.Y.S.2d 408 (3d Dep't 1974), and the New York Court of Appeals, People v. Broadie, 37 N.Y.2d 100, 371 N.Y.S.2d 471, 332 N.E.2d 338, cert. denied, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975), in face of an attack that the sentence was unconstitutional because it constituted cruel and unusual punishment.
 
 
 11
 C) Proceedings Below.
 
 
 12
 Appellees in their 28 U.S.C. § 2254 petitions launched a broad-based attack on the constitutionality of certain sections of the New York Penal Law, Criminal Procedure Law, and Correction Law, as amended in 1973, (1973 Drug Law) which apply to class A felony offenders, and under which Carmona and Fowler were sentenced.[3] Judge Motley held:(I)n the case of Ms. Carmona and Ms. Fowler, the life sentences are so disproportionately severe as to violate the Eighth Amendment. The court does not thereby hold, of course, that the life sentences provided for class A felons could never be applied in any case consistent with the strictures of the Eighth Amendment.
 
 
 13
 436 F.Supp. at 1174 n.78. The major question on appeal is whether the mandatory maximum sentence of life imprisonment imposed on appellees is unconstitutional under the Eighth Amendment.[4]
 
 II
 
 14
 At the outset we recognize that the constitutional prohibition is not limited to sanctions which involve torture or other barbaric modes of punishment. Since Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) there has been a growing acceptance of the proposition that punishment which is disproportionate to the gravity of the crime committed is violative of the Eighth Amendment. Downey v. Perini, 518 F.2d 1288 (6th Cir.), vacated and remanded, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); Griffin v. Warden, 517 F.2d 756 (4th Cir.), cert. denied, 423 U.S. 990, 96 S.Ct. 402, 46 L.Ed.2d 308 (1975); In re Lynch, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1973); People v. Lorentzen, 387 Mich. 167, 194 N.W.2d 827 (1972); Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stanford L.Rev. 838, 853 (1972); Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif.L.Rev. 839 (1969); Note, Drug Abuse, Law Abuse and the Eighth Amendment: New York's 1973 Drug Legislation and the Prohibition against Cruel and Unusual Punishment, 60 Cornell L.Rev. 638, 645-46 (1975); 44 Fordham L.Rev. 637 (1975). This principle was recognized by the district court here as well as the New York Court of Appeals in Broadie. We do not take issue therefore with the principle applied but rather find that the court below erred in its application.
 
 
 15
 There is no direct authority in the Supreme Court to guide us since, as the district court acknowledged, 436 F.Supp. at 1163, that Court has never found a sentence imposed in a criminal case violative of the Eighth Amendment merely because of its length. Downey v. Perini, supra ; 44 Fordham L.Rev. 637, 644 (1975). Since the passage of the Eighth Amendment a majority of the Supreme Court has struck down only two non-capital punishments as cruel and unusual. Both involved elements of cruelty and not simply excessive terms.[5] The Court has recently given plenary review to cases involving capital punishments and concluded that in some instances the death penalty is proscribed by the Eighth Amendment.[6] The capital punishment cases provide some instruction here, particularly on the great deference which is to be given to the legislative election of penalties. Although on this appeal it was suggested that a mandatory life sentence is a more egregious penalty than death, the hyperbole in that argument was succinctly exposed by Mr. Justice Marshall in his separate concurring opinion in Furman v. Georgia, 408 U.S. 238, 346, 92 S.Ct. 2726, 2781, 33 L.Ed.2d 346 (1972):
 
 
 16
 Death is irrevocable; life imprisonment is not. Death, of course, makes rehabilitation impossible; life imprisonment does not. In short, death has always been viewed as the ultimate sanction, and it seems perfectly reasonable to continue to view it as such.
 
 
 17
 While we have no Supreme Court case directly in point, we accept the proposition that in some extraordinary instance a severe sentence imposed for a minor offense could, solely because of its length, be a cruel and unusual punishment. This is not the case at hand.
 
 A. The Test
 
 18
 As it has developed, the "proportionality" test for determining whether a sentence for a crime is so excessive as to violate the Eighth Amendment consists of three steps: 1) a judgment on the seriousness of the offense; 2) a comparison of the punishment imposed with that fixed for other crimes within the jurisdiction; and 3) a comparison of the sentence under review with those authorized in other jurisdictions for the same crime. Hart v. Coiner, 483 F.2d 136 (4th Cir. 1973), cert. denied, 415 U.S. 938, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974); In re Lynch, supra; People v. Broadie, supra ; 44 Fordham L.Rev. 637 (1975); 1976 Wisconsin L.Rev. 655. Although the aim of this test is to reduce the amount of judicial subjectivity in Eighth Amendment jurisprudence, it is quite obvious that the first step can easily become a vehicle for the substitution of the policy views of individual judges for those of the legislature. Rummel v. Estelle, 568 F.2d 1193, 1202 n.3 (5th Cir. 1978) (Thornberry, J., dissenting); 52 N.C.L.Rev. 442, 452-53; 1976 Wisconsin L.Rev. 655, 667-69; see Morris, The Future of Imprisonment: Toward a Punitive Philosophy, 72 Mich.L.Rev. 1161, 1172-73 (1974); Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stanford L.Rev. 838, 856-62 (1972). The Supreme Court has enunciated guidelines which restrain a court in its review of the legislative conclusion as to the danger represented by a crime. It is not open to question that this determination in the first instance is legislative and not judicial. "(T)he power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime, and ordain its punishment." United States v. Wiltberger, 18 U.S. (5 Wheat.) 76, 93, 5 L.Ed. 37 (1820) (Marshall, C. J.); see Gore v. United States, 357 U.S. 386, 393, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958). As Mr. Justice Stewart stated in his opinion in Gregg v. Georgia, 428 U.S. 153, 175-76, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976):
 
 
 19
 Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.
 
 
 20
 This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "(I)n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." Furman v. Georgia, supra (408 U.S.), at 383 (92 S.Ct., at 2800) (Burger, C. J., dissenting). The deference we owe to the decisions of the state legislatures under our federal system, id., at 465-470 (92 S.Ct., at 2842-2844) (Rehnquist, J., dissenting), is enhanced where the specification of punishments is concerned, for "these are peculiarly questions of legislative policy." Gore v. United States, 357 U.S. 386, 393 (78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405) (1958). Cf. Robinson v. California, 370 U.S., at 664-665 (82 S.Ct., at 1419-1420); Trop v. Dulles, 356 U.S., at 103 (78 S.Ct., at 599) (plurality opinion); In re Kemmler, 136 U.S. (436), at 447 (10 S.Ct. 930, at 933, 34 L.Ed. 519). Caution is necessary lest this Court become, "under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility . . . throughout the country." Powell v. Texas, 392 U.S. 514, 533 (88 S.Ct. 2145, 2154, 20 L.Ed.2d 1254) (1968). A decision that a given punishment is impermissible under the Eighth Amendment cannot be reversed short of a constitutional amendment. The ability of the people to express their preference through the normal democratic processes, as well as through ballot referenda, is shut off. Revisions cannot be made in the light of further experience. See Furman v. Georgia, supra (408 U.S.), at 461-462 (92 S.Ct., at 2839-2840) (Powell, J., dissenting).
 
 
 21
 We glean from these opinions the guidelines which are here controlling. The paramount role of determining that the punishment fit the crime is that of the legislature of the state. Obviously that legislative discretion is not untrammeled. The Eighth Amendment precludes the state from wanton cruelty or a callous indifference lest a cruel and unusual punishment be inflicted. However, in view of the deference we must pay under our federal system to the judgment of the state legislature charged with the responsibility of assessing and reflecting the contemporary standards of its constituency which elected it to office, the policy which motivated its decision must be reviewed with great caution lest, in the guise of judicial review, we substitute our views on this pressing social problem for those of the elected representatives of the people. We must assume the penalty's validity and a heavy burden rests upon those who make the constitutional challenge.
 
 B. The Crime
 
 22
 The crucial issue therefore becomes whether the New York State Legislature's assessment of the dangerousness of the crimes of selling and of possessing cocaine with an intent to sell it, as reflected in the punishment imposed, is so unreasonable that it violates the constitution by allotting an excessively severe penalty for the crime. In deciding this issue, we must bear in mind the legislature's obvious institutional advantage in determining the magnitude of the harm done to societal interests and the public weal.[7] We have the benefit here of the scholarly and thorough opinion of Chief Judge Breitel for the unanimous New York Court of Appeals in People v. Broadie, supra, in which that court, after applying the same test as did the federal district court below, upheld the constitutionality of the 1973 Drug Law provisions now under attack. Broadie involved consolidated appeals from three Appellate Departments of the Supreme Court of New York. The intermediate appellate courts had unanimously upheld those statutes in face of an Eighth Amendment attack.[8] One of the appellants in Broadie was Roberta Fowler, who is an appellee here.
 
 Judge Breitel's analysis was penetrating:
 
 23
 The gravity of the offense is obviously key, as is the gravity of the danger which the offender poses to society. Given grave offenses committed or committable by dangerous offenders, the penological purposes of the sentencing statutes, whether they be the rehabilitation or isolation of the offenders or the deterrence of potential offenders, will be decisive.
 
 
 24
 In assessing the gravity of a criminal offense, the primary consideration is the harm it causes society. The Legislature, in making this assessment, could properly view criminal narcotics sales not as a series of isolated transactions, but as symptoms of the widespread and pernicious phenomenon of drug distribution. Social harm in drug distribution is great indeed. The drug seller, at every level of distribution, is at the root of the pervasive cycle of destructive drug abuse.
 
 
 25
 Defendants would minimize drug trafficking by arguing that it is not a crime of violence. Because of their illegal occupation, however, drug traffickers do often commit crimes of violence against law enforcement officers and, because of the high stakes, engage in crimes of violence among themselves.
 
 
 26
 More significant, of course, are the crimes which drug traffickers engender in others. The seller often introduces the future addict to narcotics. The addict, to meet the seller's price, often turns to crime to "feed" his habit. Narcotics addicts not only account for a sizable percentage of crimes against property; they commit a significant number of crimes of violence as well.
 
 
 27
 Thus the Legislature could reasonably have found that drug trafficking is a generator of collateral crime, even violent crime. And violent crime is not, of course, the only destroyer of men and the social fabric. Drug addiction degrades and impoverishes those whom it enslaves. This debilitation of men, as well as the disruption of their families, the Legislature could also lay at the door of the drug traffickers.
 
 
 28
 Measured thus by the harm it inflicts upon the addict, and, through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank.
 
 
 29
 37 N.Y.2d at 112-13, 371 N.Y.S.2d at 476-77, 332 N.E.2d at 342 (citations omitted).
 
 
 30
 Judge Motley, however, found the reasoning of Broadie flawed because "a penalty cannot be justified solely by the potential (of that crime) for more serious conduct even though it may be violent or dangerous." 436 F.Supp. at 1169. We cannot agree.[9] As the First Circuit has recently explained, "Society has a right to prohibit and punish not only overtly criminal conduct but other conduct which creates danger, or a sufficient probability of danger, to the community at large." McQuoid v. Smith, 556 F.2d 595, 599 (1st Cir. 1977). Indeed, it is a truism that "(i)njury to society need not be direct harm to a person or his property; it can be the slow undermining of societal values and rules believed to be necessary to enable men to live together in peace . . . ." Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stanford L.Rev. 838, 851 (1972).
 
 
 31
 As Judge Marvin Frankel has pointed out, "Drug abuse . . . may be our most harrowing problem today." M. Frankel, Criminal Sentences 99 (1973). Drug abuse has become epidemic, particularly in New York City which has more than half of all the drug addicts in the nation. People v. Broadie, supra, 37 N.Y.2d at 116, 371 N.Y.S.2d at 480, 332 N.E.2d at 345. The crime it spawns is well recognized. Addicts turn to prostitution, larceny, robbery, burglary and assault to support their habits. The profits are so lucrative that police and law enforcement agents have become corrupted.[10] Human lives have become degraded. How could any responsible legislative body in determining the gravity of drug selling fail to take into consideration the contagious, epidemic menace to the health, safety and welfare of the citizenry that it poses? Indeed, the legislature's failure to recognize the severity of the assault on the societal interests of the community would, in fact, be a cause for alarm.
 
 
 32
 Appellees urge that the amounts of drugs involved here were small.[11] However, the petitioners were unquestionably engaged in sale for a profit. The nature of the drug trafficking trade is well known it is a highly organized venture involving importation or manufacture by major groups who in turn supply wholesalers who sell to retailers with eventual peddling by those who sell small quantities to consumers. The entire system depends upon ultimate disposition by sellers such as the defendants here, who as Judge Breitel has pointed out are, "the crucial link" in the pernicious cycle spawning the addiction which creates other sellers. People v. Broadie, supra, 37 N.Y.2d at 114, 371 N.Y.S.2d at 478, 332 N.E.2d at 343. We conclude that the legislature could only properly judge the severity of the crime involved by considering the well understood and undisputed operating procedures of the dirty business involved and its disastrous consequences.[12]
 
 C. The Punishment
 
 33
 The power of the state to regulate drug traffic within its borders in the interest of public health and welfare is firmly established. Whipple v. Martinson, 256 U.S. 41, 45, 41 S.Ct. 425, 65 L.Ed. 819 (1921). The discretion of the legislature in this area is unquestionably broad. As Mr. Justice Stewart pointed out in his opinion for the Court in Robinson v. California, 370 U.S. 660, 664, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), the state's regulation of drugs may take a variety of forms. "(T)he range of valid choice which a State might make in this area is undoubtedly a wide one, and the wisdom of any particular choice within the allowable spectrum is not for us to decide." Id. at 665, 82 S.Ct. at 1420.
 
 
 34
 The New York experience in attempting to combat the drug problem is instructive. In 1967 Governor Rockefeller sponsored a provision which eventually became § 220 of the New York Penal Code. That statute created a Narcotics Addiction Control Commission with the laudable purpose of emphasizing treatment of the addict and not incarceration. The program cost the New York taxpayers over $1 billion between 1967 and 1973. The vast majority of those who were treated were not cured but in fact became recidivists. Criminal Law, 1976 Annual Survey of American Law 313, 353 n.268. See also Hardt and Brooks, Social Policy on Dangerous Drugs: A Study of Changing Attitudes in New York and Overseas, 48 St. John's L.Rev. 48 (1973). In his message to the legislature in 1973 the Governor stated, "Either we can go on as we have been, with little real hope of changing the present trend; (o)r we must take those stern measures that, I have become convinced, common sense demands." 1973 N.Y.Leg.Doc. No. 1 at 18. The 1973 law was quite clearly a direct response to popular concern over the escalating crime rate. Id. at 16. "A Gallup poll in that year revealed that almost seventy percent of Americans supported harsher drug penalties. In fact, during the 1973 session, many members of the New York state legislature favored even more stringent penalties than were ultimately adopted. The original bill submitted to the legislature, which called for a life sentence without parole for the sale of any amount of narcotic drugs, hallucinogens, or amphetamines, commanded substantial support." Criminal Law, 1976 Annual Survey of American Law 313, 353 (footnotes omitted).
 
 
 35
 The law under attack here is summarized in note 3. Its purposes were isolation and deterrence. People v. Broadie, supra, 37 N.Y.2d 114, 371 N.Y.S.2d 478, 332 N.E.2d 343. The New York statute differentiates among defendants with respect to minimum terms depending upon the amount and type of drug sold. The court below found that the imposition of the mandatory life imprisonment term was excessively disproportionate to the crimes here committed. 436 F.Supp. at 1172. The district court recognized that it was entirely possible and even probable that both appellees would be released from prison substantially before the expiration of their maximum term. Nonetheless it held for ". . . Eighth Amendment purposes, the court must judge the severity of their punishments by looking to the maximum term possible under the judgment of the sentencing court in this case, life imprisonment." Id. at 1165. This was because the court determined appellees had no right to release at an earlier time but "only after full service of (their) sentence(s)", Menechino v. Oswald, 430 F.2d 403, 408 (2d Cir. 1970), cert. denied, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971), and their release was within the discretion of the Parole Board. Id. The court relied on People v. Broadie, supra, and In re Lynch, supra, for its conclusion that the sentences must be judged by their maximum.[13]
 
 
 36
 We cannot agree that the recognized probability of parole in the cases before us was to be ignored when the court determined whether the statutory punishment was unconstitutional as applied to appellees. On the one hand, we are asked to look at all the circumstances which would ameliorate the seriousness of petitioners' offenses and their individual culpability in order to justify a finding that their punishment was constitutionally offensive. On the other hand, we are asked in effect to consider the appellees so incorrigible that they must be deemed destined to durance vile for the rest of their natural lives because they will never be paroled. We do not consider this to be a realistic or practical approach. See 61 Calif.L.Rev. 418, 422 (1973).
 
 
 37
 We are told that the New York Parole Board is stringent, that it lacks standards and that its determinations are beyond the jurisdiction of the federal court. The suggestion that the federal court act as a New York parole board determining which prisoner should be released and under what conditions is not at all palatable as a practical matter, Wolfish v. Levi, 573 F.2d 118, 120 (2d Cir. 1978), to say nothing of the offense to the principles of comity and federalism. Cf. Rizzo v. Goode, 423 U.S. 362, 378-81, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). This court has properly reviewed cases where state prisoners have alleged denial of due process rights or other constitutional imperfections in parole procedures.[14] There is no reason to anticipate that either the petitioners here will be denied a constitutionally proper parole hearing or that the federal courts will hesitate to intervene if their constitutional rights are violated in the state proceedings. We conclude that in determining the severity of the sentences imposed here we cannot consider them equivalent to life sentences without parole.[15] Rather we must view the punishment as set forth by the statute which provides that the defendants here are eligible for parole, as are all other felons in the state, at the conclusion of their mandatory minimum sentences.
 
 
 38
 In determining the severity of the sentences imposed, we properly take into account the punishment levied by the State of New York for other serious crimes as well as the punishment levied by other jurisdictions for the crime charged. Coker v. Georgia, supra, 97 S.Ct. at 2867-68 (plurality opinion). In People v. Broadie, supra, 37 N.Y.2d at 115-16, 371 N.Y.S.2d at 479-80, 332 N.E.2d at 344-345, as well as below, 436 F.Supp. at 1166, this issue was thoroughly canvassed. In New York murder in the first and second degree, arson in the first degree and kidnapping in the first degree are the only crimes which carry mandatory life terms.[16] As Judge Oakes indicated in United States ex rel. Daneff v. Henderson, 501 F.2d 1180, 1184 (2d Cir. 1974), quoting Pennsylvania v. Ashe, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937), "The comparative gravity of criminal offenses, and whether their consequences are more or less injurious, are matters for (the state's) determination." Collins v. Johnston, 237 U.S. 502, 510, 35 S.Ct. 649, 653, 59 L.Ed. 1071 (1915); Howard v. Fleming, 191 U.S. 126, 135-36, 24 S.Ct. 49, 48 L.Ed. 121 (1903). Our inquiry is therefore limited. The purposes of the Drug Law of 1973 were isolation and deterrence, rehabilitation having failed. The law was enacted after thorough study and investigation. Drug trafficking and its attendant evils posed an imminent threat to the community which the legislature could reasonably consider to be comparable to or of greater import than arson, kidnapping, manslaughter or rape. We cannot sensibly characterize that determination as arbitrary or irrational.[17] It is also conceded that New York punishes drug trafficking more harshly then other jurisdictions, People v. Broadie, supra, 37 N.Y.2d at 116, 371 N.Y.S.2d at 480, 332 N.E.2d at 345; 436 F.Supp. at 1166-68; but again, the problem is more severe there as New York city houses more than half of all the addicts in the entire United States. If the punishment must fit the crime, the legislature must look at the crime as found in its own borders and the action of the states faced with drug problems of lesser magnitude are of little relevance. In Coker, supra, the plurality compared the punishment levied by various states for the crime of rape and found Georgia's punishment of death was unique. But there was no indication that Georgia was the rape capital of the United States. Unfortunately, the plague which is here under attack is most virulent in New York and the response of that state was predictably more harsh. See Rummel v. Estelle, supra, 568 F.2d at 1200 n.13.
 
 
 39
 Appellees finally urge that under Coker v. Georgia, supra, 97 S.Ct. at 2865 (plurality opinion), the court below could also have found the punishment to be judged excessive if it "makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering." Of course Coker involved the death penalty which, as we have observed, is the ultimate sanction and thus "occupies a special place in eighth amendment jurisprudence." Hall v. McKenzie, 537 F.2d 1232, 1235 (4th Cir. 1976). Appellees urge however that the 1973 Drug Law has not worked and therefore, since it has not fulfilled its purpose, it is "(a) purposeless and needless imposition of pain and suffering."
 
 
 40
 The Coker test of excessiveness quoted above was derived from Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (opinion of Stewart, J., concurred in by Powell and Stevens, JJ.), which indicated that punishment is excessive if it involves "the unnecessary and wanton infliction of pain." Since we have already determined that the punishment was not "grossly out of proportion to the severity" of the crime, we cannot view it as an unnecessary and wanton infliction of pain. Certainly its stated purposes to achieve the isolation and the deterrence of drug traffickers are acceptable goals of punishment. Trop v. Dulles, 356 U.S. 86, 111, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (Brennan, J., concurring). Appellees' argument really is that the statute has not worked and is therefore an imprudent or unwise penalty. But the cases have emphasized that it is not our function to determine the wisdom of the legislative determination. We cannot equate lack of wisdom with wanton infliction of needless pain. Appellees urge that we take into consideration the views of bar associations, penologists and even prosecutors who have expressed the view that the 1973 Drug Law penalties have not stopped the problem. They urge that drug addition continued to be epidemic and that violent drug-related crime persists.[18] This argument of course not only emphasizes the gravity and enormity of the crime but it clearly suggests the proper tribunal to which such complaints should be made the legislature of the State of New York. Governor Carey earlier this year appointed a distinguished committee of those experienced in penology and criminology to study sentencing in New York and admittedly that committee will study the statutes here under attack.[19]
 
 
 41
 It is not our function, nor are we adequately equipped to determine what measures the legislature should take and how effective such measures may prove to be in comparison to those previously tried. We cannot easily characterize the legislature of New York as retrograde, reactionary or arbitrary. We do not judge either the wisdom of the 1973 Drug Law or its efficacy. Our role is not to grant an imprimatur but only to determine whether the punishment meted out here is so egregious as to transgress the constitutional inhibition against cruel and unusual punishments. No decision of the Supreme Court, this court or the highest court of the State of New York has ever found a sentence of imprisonment to transgress the Eighth Amendment merely because of its length. There may well be such a case but this is surely not it. In view of the extraordinary crisis faced by the State of New York, caused by the crime of drug trafficking, we cannot agree with the district court that the punishments meted out to the appellees here are constitutionally defective. We therefore reverse the district court judgment and remand for the entry of an order in accordance with this opinion.
 
 OAKES, Circuit Judge (dissenting):
 
 42
 The Joint Committee of the Association of the Bar of the City of New York and the Drug Abuse Council have concluded that the operation of the 1973 New York drug law has had no real deterrent effect on drug abuse or on resulting felonious property crimes. If anything, the Committee found, the law has caused a reduction in the number of drug convictions obtained and has made no measurable contribution to acceptable goals of punishment. See Association of the Bar of the City of New York/Drug Abuse Council, Inc., The Nation's Toughest Drug Law: Evaluating the New York Experience at 3, 7, 33, 41, 43-44, 59, 61, 87, 89, 95, 96 (1977) (Final Report of the Joint Committee on New York Drug Law Evaluation). Indeed, as the majority notes, ante at 416, Governor Carey has appointed a committee to suggest revision of the laws. Nevertheless, possible future legislative change does not absolve this court from its duty of determining here and now whether the imposition of life imprisonment on these two appellees contravenes the Eighth Amendment.
 
 
 43
 Appellee Martha Carmona was convicted of possessing one ounce of cocaine[1] and appellee Roberta Fowler for a "street sale" of $20 worth or .00455 ounce of the same substance.[2] For each of these crimes, which we are told thousands of New Yorkers regularly if regrettably commit, a sentence with a maximum term of life imprisonment was imposed.[3] The majority purportedly accepts the well-established rule that the Eighth and Fourteenth Amendments[4] prohibit punishments which are grossly disproportionate to the crimes which occasion them. But in reality, their opinion pays only lip service to the proportionality requirement. The opinion improperly focuses on less severe sentences than those actually imposed, undervalues the historical justifications and precedents which support the proportionality rule and affords undue deference to the legislative election of penalties. I, therefore, respectfully dissent.
 
 I. THE SENTENCE
 
 44
 Before applying the constitutional standard to appellees' punishments, the fundamental question of precisely what sentence is to be evaluated must be resolved. I believe that we must test the validity of the maximum sentence imposed, while the majority would select some lesser sentence.
 
 
 45
 The majority opinion recognizes that the "major question on appeal is whether the mandatory maximum sentence of life imprisonment imposed on appellees is unconstitutional under the Eighth Amendment." Ante at 408 (footnote omitted) (emphasis added). But then it declines to examine the validity of a life sentence for the crimes committed. Instead, it discounts the life sentence by the "probability of parole" and tests the constitutionality of that ill-defined lesser sentence. This approach is, I suggest, unacceptable.
 
 
 46
 In Judge Motley's scholarly opinion below, she tested the constitutionality of appellees' punishments by looking to the maximum prison term they might serve even though it was "entirely possible, and indeed probable" that they would both be released substantially sooner. Carmona v. Ward, 436 F.Supp. 1153, 1165 (S.D.N.Y.1977). To support this approach, the district judge relied upon People v. Broadie, 37 N.Y.2d 100, 110, 371 N.Y.S.2d 471, 474, 332 N.E.2d 338, 341, cert. denied, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975), where the New York Court of Appeals considered mandatory lifetime sentences with the possibility of "lifetime parole on parole release" as life sentences.[5] She also cited In re Lynch, 8 Cal.3d 410, 419, 105 Cal.Rptr. 217, 223, 503 P.2d 921, 927 (1972) (en banc), where the California Supreme Court treated a sentence of "not less than one year" as equivalent to a punishment of one year to life imprisonment[6] and then judged the constitutionality of the maximum sentence. See Comment, 44 Fordham L.Rev. 637, 641 (1975).
 
 
 47
 While Judge Mulligan's opinion does not attempt to distinguish Lynch, it finds Broadie "readily distinguishable." Ante at n.13. The majority points out that the New York sentencing laws in effect at the time of Broadie[7] provided that persons convicted of Class A drug-related felonies could never be discharged from parole.[8] This harsh treatment was repealed by a 1977 amendment[9] to allow Class A drug felons to be discharged from parole on the same basis as all other parolees. Therefore, the majority reasons, "the lifetime threat that a parolee may return to prison has been removed," id., and Judge Motley's reliance on Broadie is misplaced. This reasoning is unsound.
 
 
 48
 It is true that Broadie is distinguishable on the basis that prior to the 1977 amendment to the corrections law, see note 9 supra, Class A drug felons were subject to mandatory lifetime parole whereas thereafter discharge from lifetime parole is in the parole board's discretion. However, that distinction does not make a difference for three reasons.
 
 
 49
 First, nothing in Broadie indicates that selecting the Class A drug felon's maximum sentence for evaluating its constitutionality was dependent upon serving mandatory lifetime parole rather than discretionary lifetime parole. That a Class A drug felon might be discharged from lifetime parole in the exercise of the parole board's discretion does not take away from the proposition that any violation of parole prior to the actual exercise of the parole board's discretion subjects the felon to the full life term.
 
 
 50
 Second, the majority's approach will inevitably enmesh federal courts in parole discharge decisions. Ordinarily such decisions are matters for state authority, absent some peculiar, constitution-implicating circumstance. However, if appellees have "a constitutional right not to be (maintained on parole for life, post at 422-426), then (New York) may not deprive (them) of that right by suggesting it may be willing to interdict its denial by the future exercise of discretion which (is) a matter of administrative grace." Rummel v. Estelle, No. 76-2946, 568 F.2d 1193, 1196 (5th Cir. 1978) (rejecting Texas' claim that possibility of parole prevents evaluation of constitutionality of life imprisonment imposed pursuant to Texas' recidivist statute). "Indeed, if the proportionality of (appellees') sentence(s) and hence (their) constitutionality depended upon the availability of (discharge from) parole, we would have to make a careful review of procedures and evidence in (discharge) proceedings, since the availability of (discharge) in fact and the accuracy of individual (discharge) decisions then would measure constitutional dimensions." Id. The point is that if the maximum sentences[10] here at issue were unconstitutionally disproportionate to the crimes, as I suggest that they are, post at 422-426 then the determination of some lesser sentence's constitutionality lesser by virtue of the possibility of discharge from parole would ultimately depend on federal court entanglement in state decisions denying discharge. This is an unsatisfactory prospect, and one whose full implications are not appreciated by the majority.
 
 
 51
 And third, Judge Motley's and the Broadie and Lynch courts' approach is sound as a matter of common sense. It is true that appellees might be paroled and discharged from parole before the expiration of their full terms. However, both parole[11] and discharge from parole[12] are within the discretion of the parole board, so that it is also possible that appellees might never be paroled or discharged from parole.[13] Thus, the majority's argument for testing the constitutionality of a lesser sentence than defendant's maximum exposure is not analytically very different from saying that the defendant's sentence in Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), should not have been considered to be the death penalty because of the possibility of executive pardon. Clearly, such a result is nonsensical in the Coker context. It hardly makes any more sense here because the possibility of serving the full term exists, and it is "(t)he threat (that) makes the punishment obnoxious." Trop v. Dulles, 356 U.S. 86, 102, 78 S.Ct. 590, 599, 2 L.Ed.2d 630 (1958).
 
 II. THE PROPORTIONALITY RULE
 
 52
 While the majority accepts the principle that a punishment grossly disproportionate to the crime for which it is imposed violates the Eighth Amendment, it nevertheless avoids applying the rule. The majority belittles the rule's historical and precedential underpinnings by unduly emphasizing that "(n)o decision of the Supreme Court, this court or the highest court of the State of New York has ever found a sentence of imprisonment to transgress the Eighth Amendment merely because of its length."[14] In my view, the approach is both historically and analytically unsound.
 
 A. History and Development of the Rule
 1. The Supreme Court
 
 53
 The Eighth Amendment's history and the development of its decisional law[15] firmly support the conclusion that length of imprisonment can be sufficiently disproportionate to the underlying crime to be cruel and unusual punishment.[16] For present-day analysis, the bedrock decision in the proportionality strand of Eighth Amendment law is Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), which held that disproportionate punishment violates the prohibition against cruel and unusual punishment. The majority here strongly intimates that the Weems holding is really based on cruelty in the sentence. Ante at n.5 & accompanying text. While it is true that the Weems penalty involved an element of cruelty, a more perceptive reading of the case demonstrates that the holding actually rested on the principle of proportionality. Writing for the Court, Mr. Justice McKenna did not invalidate the punishment because the method was barbarous.[17] Instead, he relied heavily upon the dissent of Mr. Justice Field in O'Neil v. Vermont, 144 U.S. 323, 337, 339-40, 12 S.Ct. 693, 36 L.Ed. 450 (1892), which was an unequivocal statement that the Constitution demands that the punishment fit the crime.[18] Weems enunciated a test[19] directed at the degree of punishment rather than the method because there can be "exercises of cruelty by laws other than those which inflict . . . bodily pain or mutilation." Weems v. United States, supra, 217 U.S. at 372, 30 S.Ct. at 551. See Note, Effectiveness of the Eighth Amendment: An Appraisal of Cruel and Unusual Punishment, 36 N.Y.U.L.Rev. 846, 875 (1961).
 
 2. Other Jurisdictions
 
 54
 Other courts, both federal and state, have been far less hesitant to embrace the Weems doctrine of proportionality than is the majority of this panel. In the federal system, the Fifth Circuit recently invalidated a life sentence under a recidivist statute because it was grossly disproportionate to the underlying crimes.[20] Rummel v. Estelle, supra. The Fourth Circuit has also held a life sentence under a similar statute unconstitutional.[21] Hart v. Coiner, 483 F.2d 136 (4th Cir. 1973), cert. denied, 415 U.S. 938, 983, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974). The court in Downey v. Perini, 518 F.2d 1288 (6th Cir.), vacated and remanded on other grounds, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975), used proportionality analysis to find a thirty- to sixty-year sentence for possession for sale and sale of a small amount of marijuana to be cruel and unusual. And in Adams v. Carlson, 368 F.Supp. 1050, 1053 (E.D.Ill.1973), sixteen-month solitary confinement of prisoners who had participated in a prison work stoppage was declared to be unconstitutionally disproportionate.
 
 
 55
 The state courts have also been less hesitant to view disproportionate punishments as unconstitutional. Even before Weems, the Supreme Judicial Court of Massachusetts had accepted the principle of proportionality: "(i)t is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment." McDonald v. Commonwealth, 173 Mass. 322, 328, 53 N.E. 874, 875 (1899), aff'd, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901). The Supreme Court of Michigan has given real meaning to the proportionality concept. In People v. Lorentzen, 387 Mich. 167, 194 N.W.2d 827 (1972), a mandatory minimum sentence of twenty years' imprisonment for selling any amount of marijuana was held to violate the Eighth Amendment. And in In re Lynch, supra, the California Supreme Court invalidated a sentence of "not less than one year"[22] as unconstitutionally severe for a second conviction of indecent exposure.
 
 
 56
 Lower courts in New York have found lengthy sentences unconstitutionally excessive. See Politano v. Politano, 146 Misc. 792, 262 N.Y.S. 802 (Sup.Ct.1933) (thirty-one-month prison term for failure to pay alimony). Prior to Broadie one New York Supreme Court justice held a Class A-III life sentence under the New York drug laws cruel and unusual. People v. Mosley, 78 Misc.2d 736, 358 N.Y.S.2d 1004 (Monroe County Court 1974), rev'd sub nom. People v. McNair, 46 A.D.2d 476, 363 N.Y.S.2d 151 (4th Dep't 1975).[23]
 
 B. The Rule in This Case
 
 57
 Whether the proportionality rule has been violated depends on a three-part inquiry: (1) into the nature of the crime, Coker v. Georgia, supra, 433 U.S. at 597-98, 97 S.Ct. 2861; (2) into the punishments for other crimes in the same jurisdiction, id. at 598-600, 97 S.Ct. 2861; and (3) into the punishments for the same crime in other jurisdictions, id. at 594-96, 97 S.Ct. 2861. See Rummel v. Estelle, supra at 1197-1198; Hart v. Coiner, supra, 483 F.2d at 140-42. Though the majority purports to apply this rubric, in reality it glosses over the three basic elements. It fails first to focus on the actual crimes of these two appellees, emphasizing instead the general evils of drugs and drug trafficking. Second, in comparing the sentences imposed by the legislature in connection with other New York crimes, the majority does not mention more serious crimes which carry lesser sentences in New York State.[24] Finally, the majority makes no real comparison with the sentences imposed by other states for drug crimes, conclusorily stating instead that the problems created by drugs are greater in the state of New York than in other states, a matter of which the majority takes judicial notice. A proper application of the proportionality test, however, leads inexorably to the conclusion that the sentences here were grossly disproportionate to the crimes and are hence unconstitutional.
 
 
 58
 1. Seriousness of the Crimes Here Involved.
 
 
 59
 We must first evaluate the seriousness of the crimes for which the individual defendants were sentenced. The fact that New York houses half the drug addicts in the country, if indeed it does, is only peripherally relevant. New York's drug problem is a socioeconomic phenomenon or set of phenomenae attributable to a great many factors with which the appellees have had nothing whatsoever to do. Appellees were not prosecuted for having initiated the phenomenon. They have participated only at the very lowest level of the scale.
 
 
 60
 Stripped to the essentials of what is involved, Ms. Fowler sold one individual dose of cocaine; Ms. Carmona possessed one ounce of cocaine; and both received sentences of life imprisonment. Yet, their crimes can hardly be considered as intrinsically serious on the one hand[25] and as inherently essential to the business of drug trafficking on the other as the crimes of the bigger wholesalers, importers, dealers or distributors of that drug or of heroin.[26] Nevertheless all receive the same maximum life sentence.
 
 
 61
 New York has completely lost sight of the true nature of the crimes involved. Appellees are not major traffickers or hardened criminals. Their offenses are simply not sufficiently horrendous to warrant life imprisonment. A perceptive federal judge has noted that "(l)ife imprisonment is the penultimate punishment. Tradition, custom, and common sense reserve it for those violent persons who are dangerous to others. It is not a practical solution to petty crime in America. Aside from the proportionality principle, there aren't enough prisons in America to hold all the (Carmonas and Fowlers) that afflict us." Hart v. Coiner, supra, 483 F.2d at 141.
 
 2. Other Crimes in This Jurisdiction
 
 62
 The second step in the proportionality test is to compare the challenged punishment to punishments for more serious crimes in the same jurisdiction. The New York drug laws fare very badly in this respect. As Judge Motley pointed out below, appellees received the same maximum sentence as New York felons convicted of first degree murder,[27] first degree arson,[28] and kidnapping in the first degree.[29] They are punished more severely than New York felons convicted of second degree arson,[30] first degree rape,[31] first degree manslaughter,[32] first degree burglary[33] and second degree kidnapping,[34] all of which carry a discretionary maximum term of twenty-five years' imprisonment. See 436 F.Supp. at 1166. It is difficult to believe that the possession of an ounce of cocaine or a $20 "street sale" is a more dangerous or serious offense than the rape of a ten-year-old, the burning down of a building occupied by people, or the killing of another human being while intending to cause him serious injury. Yet these crimes are punished less severely by the sovereign State of New York than the drug offenses in these cases.
 
 
 63
 The majority finds the crimes involved here more serious than they first appear on the basis that drug use and trafficking foster other crimes. Drug involvement may well engender the collateral crimes of robbery, burglary and prostitution; so do other evil habits, social or economic inequality or just plain greed. However, the maximum prison term in New York for first degree robbery[35] and first degree burglary[36] is twenty-five years; and prostitution carries a maximum prison sentence of three months.[37] Surely it makes little sense to argue, as the majority seems to do, that a more severe punishment may be imposed for an act because it may lead to the commission of other crimes than may be imposed for those crimes themselves. One would not rationally penalize the horse player who bets illegally with a bookmaker more than the bank embezzler even though (a) bookmakers need illegal horse bettors to operate and (b) horseplayers who work in banks and lose too much money gambling sometimes embezzle.3. This Crime in Other Jurisdictions
 
 
 64
 The final element in the proportionality equation is a comparison of the punishment in question to punishments for the same crime in other jurisdictions. Again, the New York punishments appear excessive. Both the majority and the New York Court of Appeals in Broadie concede that drug offenses are punished more severely in New York than in other jurisdictions, but seek to meliorate the harshness by emphasizing that the drug traffic is more serious in New York than elsewhere. Even so, no other jurisdiction in the United States prescribes a mandatory life sentence for sale of one ounce or less of cocaine. Indeed, only six states have statutes permitting a court to consider imposition of a life sentence on a first felony offender.[38] The most common maximum permitted is between ten and twenty years and not one of the thirty-four states in this range requires imposition of the maximum term.[39] Neither Fowler nor Carmona would have faced a mandatory sentence of life imprisonment under the law of any other state. As for Carmona, in thirty-one states the maximum penalty provided by law is less than the minimum sentence which she is serving.[40] Under the federal drug laws life sentence is authorized only where a defendant is convicted of engaging in a "continuing criminal enterprise," 21 U.S.C. § 848, which requires, inter alia, that he act as an organizer, supervisor or manager in concert with five or more other persons.
 
 
 65
 Certainly, as Judge Motley painstakingly demonstrated below, the New York laws are not in proportion with the laws in the rest of the country. Because of New York's size, location, social and economic structure, and varied demographic factors, I suppose that it is entirely possible that New York also has more serious traffic in stolen securities and counterfeit money and more income tax, nursing home and welfare fraud than other states, but if these facts were true they would not justify disproportionately higher sentences for those crimes.
 
 III. DEFERENCE TO THE LEGISLATURE
 
 66
 The majority speaks pervasively of the great deference which must be given to the legislative election of penalties, ante at 409-410; 416, weighing this against the prohibition of cruel and unusual punishment as though it somehow displaces the duty to apply the proportionality rule. I recognize fully, of course, the deference that must be paid to legislative determinations of sentence.[41] Such deference is not unlimited, however. Otherwise, the Eighth Amendment would be the deadest of letters. Mr. Justice Brennan has observed that "(j)udicial enforcement of the (Cruel and Unusual Punishments) Clause . . . cannot be evaded by invoking the obvious truth that legislatures have the power to prescribe punishments for crimes. That is precisely the reason the Clause appears in the Bill of Rights." Furman v. Georgia, 408 U.S. 238, 269, 92 S.Ct. 2726, 2741, 33 L.Ed.2d 346 (1972) (Brennan, J., concurring).
 
 
 67
 It is true that there must be room for legislative discretion, particularly in dealing with the serious drug problem in the State and the City of New York. See 436 F.Supp. at 1168. But the remedies which the legislature fashions must comply with the demands of the Constitution. Mr. Justice McKenna described the proper degree of deference owing the legislature:The function of the legislature is primary, its exercises fortified by presumptions of right and legality, and is not to be interfered with lightly, nor by any judicial conception of their wisdom or propriety. They have no limitation, we repeat, but constitutional ones, and what those are the judiciary must judge.
 
 
 68
 Weems v. United States, supra, 217 U.S. at 379, 30 S.Ct. at 554. Unconstitutional laws cannot be allowed to stand simply out of deference to the legislature. At some point a given penalty may by virtue of its inordinate length be cruel and unusual. Once one analyzes the sentences here imposed in the cool light of reason and considers the specific crimes involved, the relation of the sentences to those for other crimes in the state and to those for the same crimes in other states, life imprisonment is simply too much to withstand constitutional scrutiny.
 
 APPENDIX
 
 69
 THE ORIGIN AND MEANING OF THE EIGHTH AMENDMENT
 
 I. Introduction
 
 70
 The prohibition against cruel and unusual punishment is a basic part of the American constitutional heritage. Expressions of both the concept that punishment should be suited to the crime and the idea that punishment should not be barbarous can be found in early colonial documents.[1] Both conceptions antedated the promulgation of the English Bill of Rights in 1689, which formulated the now familiar wording "(t)hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." That clause was included verbatim in the Virginia constitution of 1776. Subsequently, eight other states included it in their constitutions with only slight variations; it was made part of the Northwest Ordinance of 1787; and it became the Eighth Amendment to the United States Constitution in 1791.[2]
 
 II. The English Origins
 
 71
 The English Bill of Rights of 1689 is often said to be a response to the Bloody Assizes.[3] More recent scholarship views it as a reaction to the sentence on the perjury conviction of Titus Oates.[4] The former view supports somewhat the idea that the provision in the English Bill of Rights was directed at preventing torturous practices and barbarous punishments since the Bloody Assizes were the culmination of a policy of torture and terror employed by the Stuarts.[5] The latter view is more consonant with the idea that the clause in the Bill of Rights of 1689 was "first, an objection to the imposition of punishments which were unauthorized by statute and outside the jurisdiction of the sentencing court, and second, a reiteration of the English policy against disproportionate penalties."[6]
 
 
 72
 Before 1689, England had established a policy against disproportionate punishment, the ancient origins of which can be traced to the laws of Moses.[7] The lex talionis an eye for an eye, a tooth for a tooth was often a harsh law, but it did demand an equivalency between the offense and the punishment.[8] A similar concept can be found in the law and philosophy of the early Greeks, the Angles and Saxons of pre-Norman England, the Germanic peoples in the Middle Ages, and the Norse Vikings.[9]
 
 
 73
 After the Norman conquest of England in 1066, the existing system of fixed, proportionate penalties was replaced with a system of discretionary amercements or fines. Excessive amercements became such a problem that three chapters of the Magna Carta were addressed to their regulation. The principal chapter clearly expressed the principle of proportionality: "A free man shall not be amerced for a trivial offense, except in accordance with the degree of the offence; and for a serious offence he shall be amerced according to its gravity, saving his livelihood . . . ."[10] A fourteenth century document, which purports to be a copy of the Laws of Edward the Confessor (1042-66), applied the same policy to physical punishment: "We do forbid that a person shall be condemned to death for a trifling offense. But for the correction of the multitude, extreme punishment shall be inflicted according to the nature and extent of the offense."[11] Thus, even before the adoption of the Bill of Rights of 1689, English law embodied the principle of proportionate punishment and a corollary prohibition of excessive punishment.[12] The English "cruel and unusual punishment" clause, especially in the context of Titus Oates' life imprisonment, would seem to have been a reiteration of this existing policy.
 
 III. The American Meaning
 
 74
 As a number of authorities have indicated, there is little in the way of recorded debate concerning the cruel and unusual punishment clauses in the United States Constitution or in the constitutions of the various states which points to the Framers' intention. At one time it was generally accepted that the American prohibition was directed against tortures and barbarous methods of punishment, despite the different thrust of the English provision.[13] Certainly, the early Eighth Amendment cases seen to adopt this view, and they gave rise to a line of cases which judge the constitutionality of a punishment by examining the method of punishment.[14]
 
 
 75
 However, more recent research suggests that the Framers were familiar with the writings of many Enlightenment thinkers, especially Beccaria, who advocated criminal law reform with the specific aim of making punishment proportionate to crime.[15] The proportionality concept appears in the writings of Thomas Jefferson.[16] In addition, several others who were instrumental in the drafting or passage of the state constitutions prohibiting cruel and unusual punishment or specifying that penalties should be proportionate to offenses including George Mason of Virginia, the "Whig Society" in Philadelphia, Benjamin Franklin, and Dr. Benjamin Rush were also familiar with Beccaria and Enlightenment penal philosophy, by way of Montesquieu and Voltaire.[17] In drafting the Bill of Rights for the United States Constitution, Madison relied upon these older, Enlightenment-influenced state constitutions, especially those of Virginia and Massachusetts,[18] to be sure, but he was also a student of Beccaria and had included Beccaria's treatise in the list of recommended books for use by the Continental Congress.[19] Thus, it is not unlikely that the "original understanding" of the Eighth Amendment prohibition was that it embodied the concept of proportion between crime and punishment in addition to precluding excessively severe and barbarous punishments.
 
 A. The Supreme Court
 
 76
 Admittedly, the first Eighth Amendment cases before the Supreme Court involved methods of punishment, and it was established early that torture and barbarities were prohibited. In doing so, however, the Court was careful not to limit the scope of the Amendment to that type of case. Thus, in Wilkerson v. Utah, 99 U.S. 130, 135-36, 25 L.Ed. 345 (1878), the Court noted: "Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution." Later, in In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1889), the Court held that death by electrocution was not "cruel and unusual" within the prohibition of the United States and New York constitutions: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."[20]
 
 
 77
 The first articulation of the doctrine that excessive or disproportionate punishment violates the Eighth Amendment came in O'Neil v. Vermont, 144 U.S. 323, 12 S.Ct. 693, 36 L.Ed. 450 (1892). The majority of the Court failed to reach the issue whether long imprisonment can be cruel and unusual, but Justice Field in a vigorous dissent maintained that it could:
 
 
 78
 The inhibition is directed, not only against (tortures), but against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted.
 
 
 79
 Id. at 339-40, 12 S.Ct. at 700. However, in Howard v. Fleming, 191 U.S. 126, 136, 24 S.Ct. 49, 48 L.Ed. 121 (1903), the Court, without clearly stating that a sentence could be cruel and unusual because of its length, held that a ten-year sentence for conspiracy to defraud was not cruel.
 
 
 80
 The first clear holding by a majority of the Court that a punishment could violate the Eighth Amendment by virtue of being excessive came in Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910). The crime in question was falsification of government documents, for which the defendant was sentenced to 15 years at hard and painful labor, with chains at his ankle and wrist, accompanied by various civil disabilities during the term of his imprisonment and life-time surveillance after his release. The Court said that "(s)uch penalties for such offenses amaze those who . . . believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." Id. at 366-67, 30 S.Ct. at 549. Justice McKenna, writing for the majority, reviewed the precedents of the Supreme Court and some of the states[21] and discussed the origin of the prohibition. Accepting the proposition that prevention of torture may have been foremost in the Framers' minds, he argued: "But surely they intended more than to register a fear of the forms of abuse that went out of practice with the Stuarts. . . . (I)t must have come to them that there could be exercises of cruelty by laws other than those which inflicted bodily pain or mutilation." Id. at 372, 30 S.Ct. at 551. He noted that "a principle, to be vital, must be capable of wider application than the mischief which gave it birth." Id. at 373, 30 S.Ct. at 551. Thus, it was appropriate to find the sentence in question cruel and unusual even though it did not involve torture. In making that determination, the Court enunciated a comparative test. It compared the penalty for the crime in question to penalties for more serious crimes in the same jurisdiction and to those for similar crimes in other jurisdictions and found the sentence in question to be so much more rigorous than other penalties that it was unconstitutionally excessive.
 
 
 81
 Six years after Weems, in Badders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706 (1916), the Court, citing but not discussing Howard v. Fleming, supra, held that five years in prison and a $7,000 fine for seven counts of placing letters in the mail as part of a scheme to defraud was not unconstitutional punishment. Justice Brandeis, dissenting in United States ex rel. Milwaukee Social Democratic Publishing Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704 (1921), argued that denial of second class postage rate to a subversive publication was "unusual in character" and might violate the Eighth Amendment, id. at 435, 41 S.Ct. 352, but the majority of the Court did not discuss the issue. A majority of five in Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), held that subjecting a convict to electrocution a second time after a first attempt at execution failed was not cruel and unusual punishment since "(t)here is no purpose to inflict unnecessary pain . . . ." and "(t)he cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment . . . ." Id. at 464, 67 S.Ct. at 376. In that case attention was focused on the method rather than the proportionality of punishment.
 
 
 82
 In Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), a four-member plurality of the Court concluded that denationalization for wartime desertion was cruel and unusual punishment. Although the desertion consisted merely of escaping from a stockade, being absent from base for less than twenty-four hours and voluntarily returning to the base, the Court did not view the case as one of disproportionate punishment. "Since wartime desertion is punishable by death, there can be no argument that the penalty of denationalization is excessive in relation to the gravity of the crime." Id. at 99, 78 S.Ct. at 597. It seemed again to be the method of punishment which the Court found reprehensible. "It is a form of punishment more primitive than torture . . .." Id. at 101, 78 S.Ct. at 598. Still, the Court looked to Weems for guidance in applying the Eighth Amendment, and actually used a Weems comparative test in noting that civilized countries almost unanimously agreed that denationalization should not be used as a punishment. Id. at 102-03, 78 S.Ct. 590. The Court also emphasized the flexibility of the prohibition: "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id. at 101, 78 S.Ct. at 598. Thus, although Trop appears to be primarily a methods case, it stresses the flexibility of the Eighth Amendment and employs a comparative test, both of which suggest the continuing vitality of the proportionality strand of Eighth Amendment law.
 
 
 83
 A California law which required ninety days' imprisonment for being addicted to narcotics was held invalid in Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). The Court said: "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." Id. at 667, 82 S.Ct. at 1421. While the analysis indicates that the Court felt the California statute punished a status or condition which involved no actual criminality at all, it also suggests that a sentence, even one which does not seem excessive, must be judged in relationship to the offense which it punishes.
 
 
 84
 The remaining Supreme Court Eighth Amendment cases all involve the death penalty. Three members of the Court, dissenting from a denial of certiorari in Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963), argued that imposing the death penalty for rape might violate the Eighth and Fourteenth Amendments. One question which Mr. Justice Goldberg found worthy of consideration was whether punishing rape by death would violate " 'evolving standards of decency that mark the progress of (our) maturing society' " in view of the trend away from such punishment, or alternatively whether it would be acceptable under a Weems comparative test. Id. at 889-91, 84 S.Ct. at 155 (footnote omitted) (bracket in original). Another was whether inflicting death for rape would be "consistent with the constitutional proscription against 'punishments which by their excessive . . . severity are greatly disproportioned to the offenses charged.' " Id. at 891, 84 S.Ct. at 155. This was clearly a call for a proportionality analysis of the death penalty.
 
 
 85
 The Court had the opportunity to make such an analysis in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), but it was an opportunity of which little use was made. Five members of the Court held that the death penalty was cruel and unusual, but the same majority could not be mustered for the rationale that it was unconstitutionally disproportionate to the offenses charged. Three of the majority Justices relied primarily on arbitrariness in the imposition of the penalty in finding it cruel and unusual;[22] and while Justices Brennan and Marshall engaged in a proportionality analysis, they also took into account elements of arbitrariness.[23]
 
 
 86
 In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), Georgia's statutory scheme for imposing the death penalty, designed to answer the charge of arbitrariness in Furman, was upheld as constitutional. There at least five Justices[24] clearly accepted the argument that a punishment can violate the Eighth Amendment simply because it is disproportionately severe. They merely differed in their evaluations of the severity of the death penalty with respect to the crime charged. But most recently, of course, the Court utilized proportionality analysis to invalidate Georgia's imposition of the death penalty for the crime of rape in certain aggravated circumstances. Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). The Court's methodology was to focus on the nature of the crime, the punishment for other crimes in the same jurisdiction, and the punishment for the same crime in other jurisdictions a classic proportionality approach.
 
 B. Lower Courts
 
 87
 State and federal courts generally regard Weems as establishing the principle that a punishment may be unconstitutionally cruel because it is disproportionate to the offense. However, the rule has infrequently been invoked to invalidate punishments.[25] For example, Hemans v. United States, 163 F.2d 228 (6th Cir.), cert. denied, 332 U.S. 801, 68 S.Ct. 100, 92 L.Ed. 380 (1947), said that "long-term imprisonment could be so disproportionate to the offense as to fall within the inhibition (of the Eighth Amendment)," id. at 237, but held that the statutory maximum of five years' imprisonment for fleeing to avoid giving testimony was not excessive. Kasper v. Brittain, 245 F.2d 92, 96 (6th Cir.), cert. denied, 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957), cited Weems but articulated a fairly strict test of constitutionality: "Punishment is not 'cruel and unusual,' unless it is so greatly disproportionate to the offence committed as to be completely arbitrary and shocking to the sense of justice." Id. at 96. The court held that a one-year sentence for contempt of court in willfully violating a court order was not excessive.
 
 
 88
 Long periods of imprisonment resulting from consecutive sentences for multiple convictions have in the past been upheld as constitutional. Anthony v. United States, 331 F.2d 687, 693-94 (9th Cir. 1964) (consecutive sentences amounting to forty years for two convictions of sale of marijuana was not cruel and unusual punishment); Smith v. United States, 273 F.2d 462, 46768 (10th Cir. 1959) (consecutive sentences amounting to fifty-two years and fines of $30,000 for fourteen violations of the marijuana and narcotics law for a first time offender were not cruel and unusual under the Eighth Amendment), cert. denied, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960); United States ex rel. Darrah v. Brierley, 290 F.Supp. 960, 964 (E.D.Pa.1968) (a total sentence of fifty to 100 years resulting from consecutive sentences on five burglary convictions was not "arbitrary and shocking to our sense of justice" and was therefore constitutional), aff'd, 415 F.2d 9, 13 (3d Cir. 1969).
 
 
 89
 Harsh sentences for single offenses have also been held constitutional. In United States v. Del Toro, 426 F.2d 181, 184 (5th Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 58, 27 L.Ed.2d 60 (1970), the court upheld a mandatory five-year sentence without possibility of probation for a first offense sale of heroin. Likewise, a mandatory five-year minimum sentence for smuggling marijuana was found not to be cruel and unusual in United States v. Avey, 428 F.2d 1159, 1164 (9th Cir.), cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 139 (1970). In Rener v. Beto, 447 F.2d 20 (5th Cir. 1971), cert. denied, 405 U.S. 1051, 92 S.Ct. 1521, 31 L.Ed.2d 787 (1972), an even more severe sentence was upheld, the court there finding that a thirty-year sentence for a second offense possession of marijuana was not cruel and unusual. The possession was of one marijuana cigarette. The court did not discuss the severity of the crime in relation to the offense, but simply said that the sentence was within the limits prescribed by statute and was therefore constitutional. The Second Circuit Court of Appeals has upheld a twenty-year sentence without parole for a second offense sale of heroin in United States v. Fiore, 467 F.2d 86, 89-90 (2d Cir. 1972), cert. denied, 410 U.S. 984, 93 S.Ct. 1510, 36 L.Ed.2d 181 (1973). The sentence was upheld with a rather summary citation to precedents, most of which involved shorter sentences, and held that denial of parole did not render a sentence cruel and unusual.
 
 IV. Recent Developments
 
 90
 In the more recent past several states have rendered decisions which are consistent with the Weems rationale. The Michigan Supreme Court overturned a sentence of twenty to twenty-one years for a first offense conviction of selling marijuana in People v. Lorentzen, 387 Mich. 167, 194 N.W.2d 827 (1972).[26] The state statute mandated a minimum sentence of twenty years. The Michigan court applied a three-tiered test to determine whether the sentence was cruel and unusual. First, it evaluated the proportionality of the sentence by comparing it to statutory penalties for other offenses in Michigan. Then the court tested it against "evolving standards of decency" by comparing it to penalties in other states for the same offense. Finally, the court engaged in an analysis of legislative ends and means, asking whether any valid legislative goals would be furthered by the imposition of the particular sentence in the specific case. The court vacated the sentence and remanded the case for resentencing, but did not go so far as to hold the statute unconstitutional.[27]
 
 
 91
 The California courts have issued a series of decisions adopting the Weems proportionality principle.[28] In the first, In re Lynch, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1972) (en banc), the state supreme court held that a sentence of not less than one year for a second conviction of indecent exposure was unconstitutionally disproportionate. In reaching this conclusion, the court first considered the length of the sentence in light of the seriousness of the offense and the character of the offender. Second, it compared the sentence to penalties for more serious offenses in the same jurisdiction, and finally it compared the sentence to punishments imposed for the same offense in other jurisdictions. Thus, both California and Michigan took the Weems comparative test as the starting point of their analysis.
 
 
 92
 The California Supreme Court applied the Lynch test in In re Foss, 10 Cal.3d 910, 112 Cal.Rptr. 649, 519 P.2d 1073 (1974),[29] to invalidate a sentence for a conviction under a statute relating to narcotics other than marijuana. Under the provisions of the statute, the defendant was to be denied consideration for parole for ten years because he had a prior drug conviction. The statute made no provision for consideration of mitigating circumstances. The court held that the penalty imposed by the statute constituted cruel and unusual punishment.
 
 
 93
 The federal courts of appeals have also exhibited a recent trend toward giving force to the Weems principle. In Hart v. Coiner, 483 F.2d 136 (4th Cir. 1973), cert. denied, 415 U.S. 938, 983, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974), and quite recently in Rummel v. Estelle, No. 76-2946, 568 F.2d 1193 (5th Cir. 1978), life sentences under recidivist statutes were found so disproportionate to the underlying crimes as to be unconstitutional. In Downey v. Perini, 518 F.2d 1288 (6th Cir.), vacated and remanded on other grounds, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975),[30] the issue before the court was whether a thirty- to sixty-year sentence for a first narcotics-related conviction of possession for sale and sale of a "small amount" of marijuana was cruel and unusual punishment.[31] The Downey court stated unequivocally that "a sentence which is disproportionate to the crime for which it is administered may be held to violate the Eighth Amendment solely because of the length of imprisonment imposed." Id. at 1290. It based its invalidation of the sentence squarely on this principle. The court employed a comparative test, comparing the sentence to penalties for more serious crimes in the same jurisdiction and to penalties for the same crime in other jurisdictions. Id. at 1291-92. The comparisons led to the conclusion that the sentence was disproportionate to the crime and was therefore constitutional.
 
 
 
 [1]
 At the time of the district court's order, Foggie was out on parole after having served approximately one year of her one year to life sentence. The court dismissed her petition without prejudice to later challenging a state determination not to discharge her from parole custody as soon as she was eligible under New York law for such consideration. In addition, Judge Motley dismissed her petition without prejudice to filing a new petition challenging her original maximum sentence in the event she was re-imprisoned pursuant thereto. Foggie has not appealed from this order
 
 
 [2]
 The lifetime parole provision of the 1973 Drug Law has been amended. See note 13, infra
 
 
 [3]
 The 1973 Drug Law provided, inter alia, for indeterminate sentences for all narcotic drug sales and for possession of narcotic drugs in quantities in excess of one ounce. Mandatory maximum life sentences were to be imposed for all class A drug felonies. N.Y.Penal Law § 70.00-2(a). For an A-I felony the minimum sentence permitted was 15 years, for an A-II felony it was six years and for an A-III felony it was one year. N.Y.Penal Law §§ 70.00-3(a)(i), (ii), (iii), 220.43, 220.41, 220.39. Cocaine, the drug involved in this appeal, is classified as a narcotic drug. Penal Law § 220.00(7); N.Y.Public Health Law § 3306. See notes 13 & 19, infra, for other provisions
 
 
 [4]
 Appellees also make an equal protection attack on the sentencing statutes. Judge Motley rejected this argument below. 436 F.Supp. at 1173-76. Although Eighth Amendment and Equal Protection analysis are not identical, there are similar elements involved in the two tests. See Furman v. Georgia, 408 U.S. 238, 257, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring); Rudolph v. Alabama, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting from denial of cert.). Here where no suspect class or fundamental interest is involved, we find that a punishment which is not so excessive in relation to the crime as to violate the Eighth Amendment, is not so irrational as to violate the Fourteenth
 Appellees also argue that the failure by the legislature when basing the crime to be charged on the aggregate weight of the drug to distinguish between possession of a pure and of a cut ounce of cocaine is so irrational as to make the statute constitutionally infirm. We find Judge Oakes' opinion in United States ex rel. Daneff v. Henderson, 501 F.2d 1180 (2d Cir. 1974) persuasive on this point and therefore reject the argument.
 
 
 [5]
 In Weems v. United States, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910) the Court found that a penalty imposed in the then United States possession, the Philippines, for the crime of falsification of documents was cruel and unusual. The punishment provided, inter alia, for 15 years painful labor while chained at the hands and the wrists, lifetime supervision and civil interdiction. In Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) the Court held that imprisonment for the status of being a drug addict was cruel and unusual punishment. A plurality of the Supreme Court in Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) found that after a deserter from the armed forces was court-martialed and given a dishonorable discharge to further punish him by stripping him of his citizenship violated the Eighth Amendment
 
 
 [6]
 E. g., Coker v. Georgia, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)
 
 
 [7]
 As one commentator has noted:
 (T)he severity half of the proportionality equation for crimes and punishments is evolutionary and depends directly upon the manner in which the public views each crime and each punishment. In a governmental structure in which determinations of public opinion are properly the province of the legislative branch, it is fundamentally impermissible for the judicial branch to arrogate that function to itself . . . .
 Wheeler, Toward a Theory of Limited Punishment: An Examination of the Eighth Amendment, 24 Stanford L.Rev. 838, 856 (1972).
 Mr. Justice Holmes recognized that declaring a legislative choice unconstitutional "is the gravest and most delicate duty that (a) Court is called on to perform." Blodgett v. Holden, 275 U.S. 142, 147-48, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927) (Holmes, J., concurring).
 
 
 [8]
 People v. Mosley, 46 A.D.2d 476, 363 N.Y.S.2d 151 (4th Dept.1975); People v. James, 46 A.D.2d 922, 362 N.Y.S.2d 1023 (2d Dept.1974) (no opinion); People v. Broadie, 45 A.D.2d 649, 360 N.Y.S.2d 906 (2d Dept.1974); People v. Venable, 46 A.D.2d 73, 361 N.Y.S.2d 398 (3d Dept.1974)
 
 
 [9]
 The district court relied on two cases striking down the imposition of the death penalty for rape. Coker v. Georgia, supra, 97 S.Ct. at 2869; Ralph v. Warden, 438 F.2d 786 (4th Cir. 1970), cert. denied, 408 U.S. 942, 92 S.Ct. 2846, 33 L.Ed.2d 766 (1972). However, when asked to apply Ralph's principles to a non-capital punishment case, the Fourth Circuit refused, stating: "Ralph has no application to the case at bar; it involved the imposition of the death penalty, which occupies a special place in eighth amendment jurisprudence." Hall v. McKenzie, 537 F.2d 1232, 1235 (4th Cir. 1976). We agree
 The recidivists' statutes which provide for longer sentences for repeat offenders present an example of a penalty created by the legislature because of considerations other than the specifics of the final underlying crime. E. g., Griffin v. Warden, 517 F.2d 756 (4th Cir.), cert. denied, 423 U.S. 990, 96 S.Ct. 402, 46 L.Ed.2d 308 (1975) (imposition of mandatory life imprisonment on third felony offender who had been convicted of breaking and entry, burglary and grand larceny is not cruel and unusual punishment). See generally Note, Don't Steal a Turkey in Arkansas The Second Felony Offender in New York, 45 Fordham L.Rev. 76 (1976).
 
 
 [10]
 The profit that can be reaped from the sale of cocaine, the drug involved in both appellees' convictions, is enormous. A kilogram may be purchased wholesale for between $14,000-20,000, and it may be sold at retail, after it has been cut for $125,000. McLaughlin, Cocaine: The History and Regulation of a Dangerous Drug, 58 Cornell L.Rev. 537, 549 (1973). More recently, the figures have been placed at $50,000 wholesale and $300,000 retail. N.Y. Times, Mar. 21, 1978 at 37, col. 1
 
 
 [11]
 Appellees are not aided by the fact that their convictions were based on cocaine and not heroin. Cocaine is a dangerous drug that causes damaging psychological and physiological effects in its users. McLaughlin, Cocaine: The History and Regulation of a Dangerous Drug, 58 Cornell L.Rev. 537, 552-54 (1973). The Alaska Supreme Court, recently upholding the classification of cocaine as a dangerous drug, discussed the evils associated with the drug. State v. Erickson, 574 P.2d 1 (Alaska 1978)
 
 
 [12]
 A recent report stated "58% of the men imprisoned in New York are users of drugs. Of the drug users 80.9% have committed major crimes other than drug-law violations usually robberies or burglaries to get money to support their drug habits." Sheehan, Annals of Crime The Prison and its Prisoner, The New Yorker, October 31, 1977 at 46, 56
 
 
 [13]
 People v. Broadie, supra, on this point is readily distinguished from the appeals at hand. When Broadie was decided the 1973 Drug Law provided that persons convicted of class A drug related offenses could never be discharged from parole. N.Y.Correction Law § 212(6) and (8). This has been repealed to allow class A drug felons to be discharged from parole on the same basis as all other parolees. Ch. 904, §§ 2, 3: § 259-j, 1977 McKinney's N.Y.Sess.Laws 1873, 1885. Therefore the lifetime threat that a parolee may return to prison has been removed
 
 
 [14]
 E. g., Williams v. Ward, 556 F.2d 1143 (2d Cir.), cert. denied, 434 U.S. 944, 98 S.Ct. 469, 54 L.Ed.2d 323 (1977); Holup v. Gates, 544 F.2d 82 (2d Cir. 1976); Haymes v. Regan, 525 F.2d 540 (2d Cir. 1975)
 
 
 [15]
 Such a sentence without hope is indeed severe yet the Sixth Circuit in Moore v. Cowan, 560 F.2d 1298, 1302-03 (6th Cir. 1977) upheld, despite an Eighth Amendment attack, the imposition of a life sentence without parole for rape
 
 
 [16]
 N.Y.Penal Law §§ 125.27 (murder first degree), 125.25 (murder second degree); 150.20 (arson), 135.25 (kidnapping), 70.00(2)(a). First degree murder required the imposition of the death penalty. N.Y.Penal Law § 60.06. However, in People v. Davis, 43 N.Y.2d 17, 400 N.Y.S.2d 735, 371 N.E.2d 456 (1977), cert. denied --- U.S. ----, 98 S.Ct. ----, 56 L.Ed.2d ---, 46 U.S.L.W. --- (July 3, 1978) the New York Court of Appeals struck down the death penalty as provided for in § 60.06
 
 
 [17]
 Federal courts have continually upheld long periods of imprisonment for narcotic offenses. E. g., Salazar v. Estelle, 547 F.2d 1226 (5th Cir. 1977) (45 years); United States v. Fiore, 467 F.2d 86 (2d Cir. 1972) (20 years without parole); McWilliams v. United States, 394 F.2d 41 (8th Cir. 1968) (25 years without parole); Smith v. United States, 273 F.2d 462 (10th Cir. 1959) (en banc), cert. denied, 363 U.S. 846, 80 S.Ct. 1619, 4 L.Ed.2d 1729 (1960) (52 year sentence and $30,000 fine on a 51 year old first offender); Black v. United States, 269 F.2d 38 (9th Cir. 1959) (30 year sentence imposed on 51 year old first offender). In the two instances where a sentence for a drug offense was found by a federal court to be cruel and unusual, the drug involved was marijuana. Downey v. Perini, 518 F.2d 1288 (6th Cir.), vacated and remanded on other grounds, 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); Davis v. Zahradnick, 432 F.Supp. 444 (W.D.Va.1977) (40 years and $20,000 fine for offenses involving less than 9 ounces of marijuana). Society's opinion is in flux concerning that particular drug. See Criminal Law, 1976 Annual Survey of American Law 313-51; compare Ravin v. State, 537 P.2d 494 (Alaska 1975) (relative harmlessness of marijuana) with State v. Erickson, 574 P.2d 1 (Alaska 1978) (dangerousness of cocaine)
 
 
 [18]
 As the following quotation indicates the evidence on the effectiveness of the 1973 Drug Law is inconclusive
 The fundamental question whether the New York law has succeeded in reducing drug traffic and removing narcotics addicts and dealers from the streets has yet to be conclusively answered. Existing evidence is ambiguous, pointing to success in some areas and failure in others.
 Despite the fear expressed by many New Yorkers that juries would prove reluctant to convict under a law entailing such harsh penalties, the conviction rate for narcotics offenders has remained relatively stable since 1973. The conviction rate in New York County (Manhattan) is approximately seventy-five percent, slightly above the seventy-two percent rate for narcotics cases tried under pre-1973 law. More significantly, the percentage of convicted narcotics offenders sent to prison increased from thirty-five percent in 1973 to sixty-two percent under the new law.
 The 1973 law has also succeeded in adding to the number of narcotics informants who, fearing the more stringent penalties, aid the police in apprehending major narcotics violators. The New York City police department reports a twenty-five percent increase in the number of informants. As a result of information received in this manner and of cooperation between federal and city prosecutors, more than 250 major narcotics violators have been arrested and most of them convicted. There is less convincing evidence that drug-related crime has decreased since passage of the 1973 law. In March 1975, the New York Times reported a decline in narcotics-related murders of more than thirty-six percent in contrast to a rise in the number of other felony-related murders.
 Other evidence shows, however, that the 1973 law has performed no better than the prior law in reducing drug traffic and narcotics-related crimes, while it has raised additional problems and imposed additional costs upon New York's law enforcement agencies. A static conviction rate for narcotics offenders hides a marked decline in the number of narcotics arrests and indictments. In 1972, 11,431 people were arrested for narcotics offenses in New York City, but this number dwindled to 7,634 arrests in 1974. The decline in indictments, though less dramatic, was still apparent.
 The 1973 law has also placed additional burdens upon New York's courts and prosecutors. Although many defendants continue to opt for guilty pleas under the new law, the restrictions on plea bargaining have induced many more defendants to demand trials, thereby intensifying the burden upon the judicial system. Moreover, a majority of those convicted under the 1973 law have been marginal offenders. Their demands for trials have diverted scarce prosecutorial and judicial resources from the most crucial task of bringing major offenders, who are often the key to curtailing drug traffic, to justice. In fact, illicit drugs are as readily available on New York's streets today as they were before the 1973 law; apparently, addicts and dealers have hardly been deterred at all by the threat of long prison sentences.
 Criminal Law, 1976 Annual Survey of American Law 313, 354-56 (footnotes omitted). As at least one commentator has noted, courts are particularly ill-equipped to judge the deterrent effect of penal sanctions. Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635, 643 (1966).
 Experts in the field have maintained that "harsh penalties . . . are a necessary component of a successful drug strategy." McLaughlin, The Poppy Is Not an Ordinary Flower: A Survey of Drug Policy in Iran, 44 Fordham L.Rev. 701, 724 (1976); see Hardt & Brooks, Social Policy on Dangerous Drugs: A Study of Changing Attitudes in New York and Overseas, 48 St. John's L.Rev. 48, 54-59 (1973).
 
 
 [19]
 Since its passage the Drug Law of 1973 has been under constant legislative scrutiny. This has already resulted in several changes such as eliminating the life-time parole provision for class A drug offenders, see note 13, and allowing class A-III offenders, previously prevented from doing so, to plead to a lesser charge. N.Y.Crim.Proc.Law § 220.10
 
 
 [1]
 Carmona was indicted for possession of 33/8 ounces of a substance containing cocaine. However, she was convicted only for possession of one ounce. See note 25 infra. This constitutes a Class A-II felony under the 1973 Drug Laws. N.Y.Penal Law § 220.18 (McKinney Supp.1977). The law provides in part:
 A person is guilty of criminal possession of a controlled substance in the second degree when he knowingly and unlawfully possesses:
 
 
 [1]
 one or more preparations, compounds, mixtures or substances of an aggregate weight of one ounce or more containing a narcotic drug
 Criminal possession of a controlled substance in the second degree is a class A-II felony.
 
 
 [2]
 A street sale is a transaction for a small amount. Nevertheless, sale of any amount of cocaine is classified as a Class A-III felony under the New York law. N.Y.Penal Law § 220.39(1) (McKinney Supp.1977). The statute provides in part:
 A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells:
 
 
 [1]
 a narcotic drug
 Criminal sale of a controlled substance in the third degree is a class A-III felony.
 
 
 [3]
 The phrase "life imprisonment" fails to convey the full impact of the sentences. Ms. Carmona was about 38 years old when she committed her crime. Ms. Fowler was about 20. According to standard life expectancies, a sentence of life imprisonment for these defendants means approximately 40.5 years and 54.6 years respectively. Absent parole, this amounts to 14,792 and 19,944 days behind cement walls and steel bars
 
 
 [4]
 Robinson v. California, 370 U.S. 660, 664, 666-67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), made it clear that the Eighth Amendment is applicable to the states through the Fourteenth Amendment
 
 
 [5]
 All of the convictions in Broadie were for either A-II or A-III felonies under New York's 1973 drug laws. Penal Law §§ 220.18, 220.39 (McKinney Supp.1977). People v. Broadie, 37 N.Y.2d 100, 110, 371 N.Y.S.2d 471, 474, 332 N.E.2d 338, 341, cert. denied, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975). Ms. Carmona's possession of one ounce of a controlled substance constitutes an A-II felony under the same statutes. See note 1 supra. Ms. Fowler's street sale of cocaine, which was also before the Broadie court, is classified as an A-III felony. See note 2 supra. In Broadie, as here, the defendants were all meted sentences with mandatory maximum terms of life imprisonment. The New York Court of Appeals viewed the sentences as life sentences: "The principal issue is whether the so-called 'drug' laws, in mandating life imprisonment and, therefore, lifetime parole on parole release, prescribe sentences so disproportionate as would constitute cruel and unusual punishment in violation of constitutional limitations." People v. Broadie, supra, 37 N.Y.2d at 110, 371 N.Y.S.2d at 474, 332 N.E.2d at 341 (citations omitted)
 
 
 [6]
 The California court reached this conclusion because their statutes treat a sentence of imprisonment for not less than a specified number of years with no limit on the duration as imprisonment during the offender's natural life. In re Lynch, 8 Cal.3d 410, 419, 105 Cal.Rptr. 217, 223, 503 P.2d 921, 927 (1972) (en banc)
 
 
 [7]
 N.Y.Correction Law § 212.8 (McKinney Supp.1977) read:
 If the board of parole is satisfied that an absolute discharge from parole or from conditional release is in the best interest of society, the board may grant such a discharge prior to expiration of the full maximum term to any parolee under an indeterminate sentence for a felony, other than the class A-I felonies of criminal possession of a controlled substance in the first degree, criminal sale of a controlled substance in the first degree, the attempt to commit such class A-I felonies, or any class A-II or A-III felony, who has been on unrevoked parole for at least five consecutive years or to any person who has been on unrevoked conditional release for at least two consecutive years. Discharge of persons under a reformatory sentence may be granted at any time, as provided in the penal law.
 A discharge granted under this section shall constitute a termination of the sentence with respect to which it was granted.
 
 
 [8]
 The discriminatory treatment accorded Class A drug felons was held unconstitutional by a Justice of the Supreme Court and affirmed on appeal by the Appellate Division. People v. Farr, 80 Misc.2d 250, 362 N.Y.S.2d 915 (Sup.Ct.1974), aff'd, 48 A.D.2d 769, 371 N.Y.S.2d 1002 (1st Dep't 1975) (mem.)
 
 
 [9]
 The new provision provides:
 If the board of parole is satisfied that an absolute discharge from parole or from conditional release is in the best interests of society, the board may grant such a discharge prior to the expiration of the full maximum term to any person who has been on unrevoked parole or conditional release for at least three consecutive years. A discharge granted under this section shall constitute a termination of the sentence with respect to which it was granted.
 1977 N.Y.Laws § 259-j, at 1885-86.
 
 
 [10]
 Under New York law, a prisoner on parole release is still in the legal custody of the State. Note 12 infra; see People v. Broadie, supra, 37 N.Y.2d at 110, 371 N.Y.S.2d at 474, 332 N.E.2d at 341. Consequently, I treat the maximum sentence as the combined total of time in prison plus time on parole. The majority view is that what makes appellees' sentences less than life terms is solely the possibility of absolute discharge from parole. See ante at n.13
 
 
 [11]
 1977 N.Y.Laws § 259-i(2)(c), at 1881
 
 
 [12]
 An absolute discharge from parole may be granted only in the discretion of the board if it is satisfied that such a discharge is "in the best interests of society . . .." Id. § 259-j, at 1885-86, quoted in note 9 supra. The range of discretion this provision affords is nearly limitless
 
 
 [13]
 Absent an absolute discharge, the parolee is in the legal custody of the State "until expiration of the maximum term or period of sentence, or expiration of the period of supervision, or return to such institution, as the case may be," id. § 259-i(2)(b), and is therefore constantly subject to reincarceration for the remainder of his or her full term, in this instance, life
 
 
 [14]
 Ante at 417. The majority's use of the word "merely" to refer to the length of a sentence of imprisonment trivializes the important constitutional principle of proportionality
 
 
 [15]
 What seems to me to be the best historical exegesis is by Schwartz & Wishingrad, The Eighth Amendment, Beccaria, and the Enlightenment: An Historical Justification for the Weems v. United States Excessive Punishment Doctrine, 24 Buffalo L.Rev. 783 (1975)
 
 
 [16]
 At the risk of some repetition, I have attached an appendix which discusses in greater detail the origin and meaning of the Eighth Amendment and its treatment by the courts, following the example of Chief Judge Breitel in People v. Broadie, supra. The emphasis of this appendix is somewhat different from that of the Broadie appendix. In addition, I do not discuss the New York State constitutional prohibition against cruel and unusual punishment, because, of course, I accept the New York Court of Appeals' view that New York's constitution is inapplicable
 
 
 [17]
 Indeed, the Weems dissent characterized the opinion as striking down solely disproportionate penalties. Weems v. United States, 217 U.S. 349, 385, 30 S.Ct. 544, 54 L.Ed. 793 (1910)
 
 
 [18]
 Mr. Justice Field said of the Eighth Amendment, "The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted." O'Neil v. Vermont, 144 U.S. 323, 340, 12 S.Ct. 693, 700, 36 L.Ed. 450 (1892)
 
 
 [19]
 The Weems test calls for a comparison of the punishment in question first to punishments for more serious crimes in the same jurisdiction and second to punishments for the same crime in other jurisdictions. Weems v. United States, supra, 217 U.S. at 380-81, 30 S.Ct. 544
 
 
 [20]
 The Texas recidivist statute required the trial court to sentence a defendant to life imprisonment upon a third conviction for any felony. Rummel was sentenced to life upon being convicted of obtaining $120.75 under false pretenses. His prior felony convictions were for presenting a credit card with the intent to defraud of $80 and passing a forged instrument with a face value of $28.36. Rummel v. Estelle, 568 F.2d 1193, 1195 (5th Cir. 1978)
 
 
 [21]
 The West Virginia recidivist statute mandated life imprisonment for anyone who was convicted three separate times of offenses punishable by penitentiary confinement. Hart was convicted of writing a check for $50 on insufficient funds, transporting forged checks in the amount of $140 across state lines, and perjury; he was therefore sentenced to life. Hart v. Coiner, 483 F.2d 136, 138 (4th Cir. 1973), cert. denied, 415 U.S. 938, 983, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974)
 
 
 [22]
 See note 6 supra
 
 
 [23]
 For a full consideration of judicial treatment of the Eighth Amendment, see Appendix
 
 
 [24]
 The majority does correctly note that first and second degree murder, first degree arson and first degree kidnapping are the only crimes not related to drugs with mandatory sentences as severe as those involved here. Ante at 414
 
 
 [25]
 Possessing or selling even the smallest conceivable amount of cocaine engenders a maximum life sentence. In this regard, I note that New York classifies drug felonies by a single aggregate weight standard. Because cocaine is sold in mixtures as weak as 5% pure, see Turner v. United States, 396 U.S. 398, 401, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970); United States ex rel. Daneff v. Henderson, 501 F.2d 1180, 1184 (2d Cir. 1974), looking to the aggregate weight of narcotic and inert dilutant may subject the holder of a truly minuscule amount of cocaine to the severe penalty for possession of an ounce. Since sale of one-eighth aggregate ounce rises to the level of an A-II felony, N.Y.Penal Law § 220.41 (McKinney Supp.1977), the trace of cocaine which may subject one to life imprisonment under this law is extraordinarily minute
 
 
 [26]
 I do not suggest that a maximum life sentence for the large dealer, distributor, wholesaler or importer who doubtless causes great harm to many people would in and of itself be cruel and unusual. I do not even say that punishing the small possessor or single-dose seller in the same fashion is necessarily so irrational as to amount to a violation of due process in the abstract or of equal protection of the laws. But I agree with the district judge that to do so is to impose a disproportionate sentence in violation of the Eighth Amendment
 
 
 [27]
 N.Y. Penal Law § 125.27 (McKinney 1975). The same maximum sentence is also awarded for second degree murder. Id. § 125.25
 
 
 [28]
 Id. § 150.20
 
 
 [29]
 Id. § 135.25
 
 
 [30]
 Id. § 150.15
 
 
 [31]
 Id. § 130.35
 
 
 [32]
 Id. § 125.20
 
 
 [33]
 Id. § 140.30
 
 
 [34]
 Id. § 135.20
 
 
 [35]
 Id. §§ 160.15, 70.00(2)(b)
 
 
 [36]
 Id. §§ 140.30, 70.00(2)(b)
 
 
 [37]
 Id. §§ 230.00, 70.15(2) (McKinney 1975 § Supp.1977)
 
 
 [38]
 Ariz.Rev.Stat. §§ 36-1002.02(A)-.03(A) (1974 & Supp.1977); Idaho Code § 37-2732(a)(1)(A) (1977); Mo.Ann.Stat. § 195.200(1)(4) (Vernon Supp.1978); Mont.Rev.Codes Ann. § 54-132 (Supp.1977); R.I.Gen.Laws § 21-28-4.01(A)(1) (Supp.1977); Tex.Rev.Civ.Stat.Ann. art 4476-15, § 4.03 (Vernon 1976). See Brief for Appellees at 41-42
 
 
 [39]
 See Brief for Appellees at 41-42
 
 
 [40]
 Id. at 42-43
 
 
 [41]
 My opinion for the panel in United States ex rel. Daneff v. Henderson, supra, is proof positive of this and a recognition of that deference in the very area of drug laws involved in this case. However, in reserving the question of constitutionality of life imprisonment for certain offenders, 501 F.2d at 1185 n.6, the panel surely had in mind the very case here involved
 
 
 [1]
 Several pre-1689 documents contained one or both ideas. For example, the Charter of Maryland (1632) recognized that punishment should be proportionate to the crime in allowing the Baron of Baltimore to establish proper penalties, "even if it be necessary and the Quality of the Offence require it, by Privation of Member, or Life." Sources of Our Liberties 107 (R. Perry ed. 1959). As early as 1632 it was considered proper that extreme penalties should attach only to very serious crimes
 The Massachusetts Body of Liberties (1641) embodies the idea of proportionality in its limitation on the maximum number of lashes which could be administered and its specification that no gentleman could be punished by whipping "unles (sic ) his crime be very shamefull." Id. at 153. It also addressed the question of acceptable methods of punishment, saying that "(f)or bodilie punishments we allow amongst us none that are inhumane Barbarous or cruel." Id.
 The Charter of Rhode Island (1663) allowed "the imposing of lawfull and reasonable ffynes, mulcts, imprisonments . . .." Id. at 173. Finally, the Frame of Government of Pennsylvania (1682) provided "(t)hat all fines shall be moderate . . .." Id. at 218.
 
 
 [2]
 Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif.L.Rev. 839, 840 (1969). Patrick Henry opposed adoption of the United States Constitution in Virginia in part because it did not contain the prohibition. Id. at 841 & n.10; see Weems v. United States, 217 U.S. 349, 372, 30 S.Ct. 544, 54 L.Ed. 793 (1910)
 
 
 [3]
 Granucci, supra note 2, at 853; Schwartz & Wishingrad, The Eighth Amendment, Beccaria, and the Enlightenment: An Historical Justification for the Weems v. United States Excessive Punishment Doctrine, 24 Buffalo L.Rev. 783, 788-89 (1975); Note, The Cruel and Unusual Punishment Clause and the Substantive Criminal Law, 79 Harv.L.Rev. 635, 636-37 (1966) (hereinafter Note, Cruel and Unusual )
 
 
 [4]
 Granucci, supra note 2, at 856-60. It is interesting to note that a principal element of Oates' sentence was imprisonment for life:
 On 17th May Sir Francis Withens, the puisne judge, pronounced the sentence of the Court upon Oates. He was to be stripped of his canonical habit, fined, and to be whipped on Wednesday, 20th May, from Aldgate to Newgate, and upon Friday, 22nd May, from Newgate to Tyburn. In addition he was to be imprisoned for life and to be pilloried three times every year.
 The Bloody Assizes 155 (J. Muddiman ed. 1929). It is also noteworthy that the Whig Convention of 1689 "declared that Oate's punishment was illegal, because a person convicted of perjury could not be imprisoned for life . . .." Id. at 156.
 
 
 [5]
 Schwartz & Wishingrad, supra note 3, at 788-89; see Granucci, supra note 2, at 852-56; Note, The Effectiveness of the Eighth Amendment: An Appraisal of Cruel and Unusual Punishment, 36 N.Y.U.L.Rev. 846, 847 (1961) (hereinafter Note, Effectiveness )
 
 
 [6]
 Granucci, supra note 2, at 860; see Schwartz & Wishingrad, supra note 3, at 789 n.15
 
 
 [7]
 Granucci, supra note 2, at 844
 
 
 [8]
 "Talio" is, of course, Latin for "equivalent to" or "equal."
 
 
 [9]
 Granucci, supra note 2, at 844
 
 
 [10]
 Magna Carta, Chapter 14, quoted in Granucci, supra note 2, at 846
 
 
 [11]
 Quoted in Granucci, supra note 2, at 846
 
 
 [12]
 For a full discussion of the origins and development of the English law, see id. at 844-47
 
 
 [13]
 Id. at 860; Note, Cruel and Unusual, supra note 3, at 636-37
 
 
 [14]
 In chronological order, see, e. g., Wilkerson v. Utah, 99 U.S. 130, 136, 25 L.Ed. 345 (1878) ("it is safe to affirm that punishments of torture . . . and all others in the line of unnecessary cruelty are forbidden . . .."); In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890) (penalty would be unconstitutionally cruel if it involved "torture or a lingering death," or "something inhuman and barbarous"); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464, 67 S.Ct. 374, 376, 91 L.Ed. 422 (1947) ("The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment . . . ."); Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (denationalization for wartime desertion held to be cruel and unusual because it is "a form of punishment more primitive than torture . . ..")
 
 
 [15]
 Schwartz & Wishingrad, supra note 3, at 808-15
 
 
 [16]
 Id. at 817-19; see, e. g., Letter to Edmund Pendleton, Aug. 26, 1776, quoted in The Portable Thomas Jefferson 355, 357 (M. Peterson ed. 1975)
 
 
 [17]
 Schwartz & Wishingrad, supra note 3, at 819-26; B. Bailyn, The Ideological Origins of the American Revolution 26-29 (1967)
 
 
 [18]
 Schwartz & Wishingrad, supra note 3, at 829-30
 
 
 [19]
 Id. at 830
 
 
 [20]
 The Kemmler court, In re Kemmler, 136 U.S. 436, 446-48, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890), assumed without deciding that the Eighth Amendment applied to the states through the Fourteenth. This issue was not actually decided until 1962 in Robinson v. California, 370 U.S. 660, 664, 666-67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), where the Court held that the Fourteenth Amendment guarantee of Due Process included the Eighth Amendment protection against cruel and unusual punishment
 
 
 [21]
 Justice McKenna referred to McDonald v. Commonwealth, 173 Mass. 322, 328, 53 N.E. 874, 875 (1899), aff'd, 180 U.S. 311, 21 S.Ct. 389, 45 L.Ed. 542 (1901) ("(I)t is possible that imprisonment in the state prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment."), quoted in Weems v. United States, 217 U.S. 349, 368, 30 S.Ct. 544, 549, 54 L.Ed. 793 (1910). But McDonald held that 25 years for forging checks where defendant had two previous convictions for three years or more was not excessive. Justice McKenna also discussed State v. Driver, 78 N.C. 423, 427 (1877) (five years' imprisonment in county jail followed by security of $500 to keep the peace for five years for assault and battery upon wife held cruel and unusual), discussed in Weems v. United States, supra, 217 U.S. at 375-76, 30 S.Ct. 544, and Hobbs v. State, 133 Ind. 404, 32 N.E. 1019 (1893) (two years in state prison for combining to assault, beat and bruise a man in the night time held not cruel and unusual. The Indiana court indicated both that the prohibition applied only to tortures, and that it was obsolete except as an admonition to the courts "against the infliction of punishment so severe as not to fit the crime"), quoted in Weems v. United States, supra, 217 U.S. at 376, 30 S.Ct. at 553
 
 
 [22]
 Furman v. Georgia, 408 U.S. 238, 240, 306, 310, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (opinions of Douglas, J., Stewart, J., and White, J.); see Schwartz & Wishingrad, supra note 3, at 804-05
 
 
 [23]
 Furman v. Georgia, 408 U.S. 238, 257, 314, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (opinions of Brennan, J., and Marshall, J.); see Schwartz & Wishingrad, supra note 3, at 805-06
 
 
 [24]
 Gregg v. Georgia, 428 U.S. 153, 171-72, 173, 187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (Stewart, Powell and Stevens, JJ.); id. at 227, 96 S.Ct. 2909 (Brennan, J., dissenting); id. at 231, 96 S.Ct. 2909 (Marshall, J., dissenting)
 
 
 [25]
 Note, Cruel and Unusual, supra note 3, at 640; Note, Effectiveness, supra note 5, at 848-49
 
 
 [26]
 For a discussion of the case, see Comment, 44 Fordham L.Rev. 637, 640-41 (1975)
 
 
 [27]
 This departs from the general rule that a sentence within prescribed statutory limits is invalid only if the entire statute is unconstitutional. See Comment, supra note 26, at 641 n.30
 
 
 [28]
 In re Adams, 14 Cal.3d 629, 122 Cal.Rptr. 73, 536 P.2d 473 (1975); In re Foss, 10 Cal.3d 910, 112 Cal.Rptr. 649, 519 P.2d 1073 (1974); In re Lynch, 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1972) (en banc); People v. Wilson, 50 Cal.App.3d 811, 123 Cal.Rptr. 663 (1st Dist. 1975); People v. Ruiz, 49 Cal.App.3d 739, 122 Cal.Rptr. 841 (1st Dist. 1975); People v. Thomas, 45 Cal.App.3d 749, 119 Cal.Rptr. 739 (1st Dist. 1975); see Comment, supra note 26, at 641 & n.32
 
 
 [29]
 For a brief discussion of this case, see Comment, supra note 26, at 642 n.41
 
 
 [30]
 The Supreme Court remanded the case for reconsideration in light of amendments to the Ohio statutes. The Court's disposition does not appear to affect the validity of the Sixth Circuit's analysis of the cruel and unusual punishment issue. See id. at 637 n.4
 
 
 [31]
 Id. at 637